

FILED

JAN 2 2 2010

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:_____ Deputy Clerk

ENTERED

JAN 2 2 2010

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:_____ Deputy Clerk

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**RIVERSIDE DIVISION**

|  |  |
|---|---|
| In re: | Case No. 6:08-bk-20682-PC |
| WOODSIDE GROUP, LLC, et al., | Jointly Administered |
| Debtors. | Chapter 11 |
| | Adversary No. 6:09-ap-01453-PC |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, on behalf of the Estate of Woodside Group, LLC, et al., | **MEMORANDUM DECISION** |
| Plaintiff, | |
| v. | Date:  November 23, 2009 |
| EZRA K. NILSON, et al., | Time:  10:00 a.m.<br>Place: United States Bankruptcy Court |
| Defendants. | Courtroom # 304<br>3420 Twelfth Street<br>Riverside, CA 92501 |

Plaintiff, Official Committee of Unsecured Creditors, on behalf of the Estate of

Woodside Group, LLC, et al. (the "Committee") seeks a preliminary injunction restricting the use

and disposition of approximately $110 million in tax refunds either received or to be received by

the Defendants, Ezra K. Nilson, Leicha B. Nilson, the Jessica Nilson Trust, the Nellie Jo Nilson

Trust, the Brett Nilson Trust, the Abby Nilson Trust, the Joy Nilson Trust, the Benjamin Ezra

Nilson Trust, Jessica Nilson, Nellie Jo Nilson, Brett Ure (f/k/a Brett Nilson), Abby Crockett

(f/k/a Abby Nilson), Joy Nilson, Benjamin Ezra Nilson, Seth Ure, David Crockett, Andrew B.

Hayworth, Nathan W. Pugsley, Bart Nilson, Kathy Nilson, Elizabeth Baker, Douglas Baker,

Jason Reese Baker, Blake Jonas Baker, Rex James Baker, Leonard K. Arave, the Jill Arave

Trust, the Matthew Len Arave Trust, the Christopher Brian Arave Trust, Jill Call-Arave (f/k/a Jill

Arave), Matthew Len Arave, Christopher Brian Arave, Michael Cosgrave, Wayne R. Farnsworth,

and Scott Nelson (collectively, the "Defendants") pending an adjudication of the merits of the

Committee's causes of action in this adversary proceeding.

At the hearing, Donald L. Gaffney, Don Bivens, and Eric S. Pezold appeared for the

1   Committee. Tony Castanares, Stephan M. Ray, and Lauren N. Gans appeared for Defendants,

2   Ezra K. Nilson ("Nilson"), Leicha B. Nilson, Leonard K. Arave ("Arave"), Nathan W. Pugsley

3   ("Pugsley"), Nelle Pugsley, Andrew B. Haywood ("Haywood"), Joy Haywood, Michael

4   Cosgrave, Jessica Cosgrave ("Cosgrave"), Scott Nelson ("Nelson"), Benjamin Ezra Nilson, Jill

5   Call-Arave, Matthew Len Arave, Christopher Brian Arave, and the Benjamin Ezra Nilson (the

6   "Nilson Defendants"). Evan C. Borges appeared for Defendants, David Crockett ("Crockett")

7   and Abby Crockett and Defendants, Seth Ure ("Ure") and Brett Ure. The court, having

8   considered the pleadings, evidentiary record, and arguments of counsel, makes the following

9   findings of fact and conclusions of law[1] pursuant to F.R.Civ.P. 52(a)(1), as incorporated into

10  FRBP 7052.[2]

## I. STATEMENT OF FACTS

A.      The Woodside Entities

Woodside Group, LLC ("Woodside Group") and its affiliates and subsidiaries (the

"Woodside Entities") operate one of largest privately held homebuilding companies in the nation.

Woodside Group is the parent company of multiple subsidiaries. Through approximately 188 of

those subsidiaries (the "Restricted Subsidiaries"), Woodside Group engages in real estate

development and residential construction in eight states. While the Restricted Subsidiaries have

significant homebuilding operations in Nevada, Arizona, Utah, Minnesota, Florida, Maryland,

and Texas, approximately 42% of the Restricted Subsidiaries' homebuilding revenues are

derived from operations in California. The operations of Woodside Group are financed through

---

[1] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent that any conclusion of law is construed to be a finding of fact, it is hereby adopted as such.

[2] Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 after its amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23 (2005). "Rule" references are to the Federal Rules of Bankruptcy Procedure ("FRBP"), which make applicable certain Federal Rules of Civil Procedure ("F.R.Civ.P.").

1  Woodside Group's affiliate, Pleasant Hill Investments, LC ("PHI").

2       Woodside Group also has subsidiaries engaged in business activities outside its

3  homebuilding operations (the "Unrestricted Subsidiaries").[3] The Unrestricted Subsidiaries

4  purchase land from third parties, hold real estate, obtain zoning and other entitlements on long-

5  term projects, reinsure the Restricted Subsidiaries, invest in joint venture projects with other

6  homebuilders, perform renovation work on government facilities, and sell land to the Restricted

7  Subsidiaries at market prices.

8       Woodside Group provides certain administrative functions for its subsidiaries including

9  cash management, employee benefits, managerial assistance, accounting, financial, planning, and

10  insurance review.  In exchange for these services, the subsidiaries pay Woodside Group an

11  administrative fee.

12       Woodside Group was profitable for nearly 30 years.  Between 2002 and 2006, Woodside

13  Group outperformed its competitors with respect to EBITDA margins by an average of between

14  5% and 9%.  Woodside Group's KPMG-audited financial statements for December 31, 2006,

15  showed assets of $1,892,664,000, liabilities of $1,059,333,000, and total equity of $824,211,000.

16  Beginning in 2007, however, Woodside Group's operations were stressed by a deterioration in

17  real estate market conditions, a significant decline in home prices, a lack of residential mortgage

18  loans, and a consistently high inventory of existing homes.  Still, the Woodside Entities

19  generated revenues exceeding $1 billion during 2007.  At the close of 2007, Woodside Group's

20  KPMG audits showed assets of $1,503,108,000, liabilities of $1,054,043,000, and equity of

21  $438,400,000.  On the date of the order for relief, the Woodside Entities had approximately $70

22  million in cash and employed approximately 494 employees.

23  _____

24  [3] The Unrestricted Subsidiaries are Liberty Holdings Group, LLC, Alameda Investments, LLC,
   JSO Land, LLC, Eagleridge Office Park, LLC, Wheatland Heritage Oaks, LLC, Hillsborough,
25  LLC, WDS MTG, LLC, Atherton Construction, LLC, Victory Holdings, LLC, Danville Land
26  Investments, LLC, Bellvue Holdings, LLC, Walnut Creek Development, LLC, WSD SE1, LLC,
   WMI Holdings, LLC, and Reliant Structural Warranty Insurance Company, Inc.
27

B.    Ownership & Management

Nilson, Woodside Group's Chairman and Chief Executive Officer, founded Woodside Group in 1977. Nelson is Woodside Group's Chief Operations Officer, and Arave serves as Woodside Group's Chief Financial Officer. Nilson, Nelson, and Arave also constitute Woodside Group's Board of Directors. Approximately 95% of the equity in Woodside Group is owned by Nilson, Nelson, and Arave (the "senior management"), and members of the Nilson family, either individually or in trust.

C.    Debt Structure

1.    JPMorgan Chase Loan Agreement

On May 5, 2006, JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), as administrative agent for JPMorgan Chase Bank, N.A., Bank of America, N.A., U.S. Bank National Association, Washington Mutual Bank, Wachovia Bank, National Association, Bank of the West, Guaranty Bank, Union Bank of California, N.A., First Commercial Bank, New York Agency, Suntrust Bank, Comerica Bank, AmSouth Bank, Compass Bank, and Wells Fargo Bank, National Association (the "Bank Group") and PHI executed a Credit Agreement (the "Credit Agreement") dated May 5, 2006, under the terms of which the Bank Group agreed to make a revolving unsecured line of credit to PHI in the maximum principal amount of $620,000,000 (the "Revolving Loan"). In conjunction therewith, Woodside Group and each of the Restricted Subsidiaries executed and delivered to JPMorgan Chase a Repayment Guaranty dated May 5, 2006, unconditionally guarantying payment of the amounts due under the Credit Agreement. Under the terms of the Credit Agreement, PHI was permitted to borrow money from the Bank Group pursuant to a borrowing base calculation, i.e., the outstanding amount of the Revolving Loan could not exceed the value of a pool of land and housing assets held by the Restricted Subsidiaries (the "Borrowing Base") minus other indebtedness of Woodside Group, PHI, and the Restricted Subsidiaries, as calculated pursuant to § 2.20 of the Credit Agreement.

On May 5, 2006, Nilson, Nelson, Arave, the Jessica Nilson Trust, the Joy Nilson Trust,

1    the Benjamin Ezra Nilson Trust, the Brett Nilson Trust, the Abby Nilson Trust, the Nellie Jo

2    Nilson Trust, Victory Holdings, Inc., Reliance Structural Warranty Insurance Company, Inc.,

3    Atherton Construction, Inc., Alameda Investments, LLC, Hillsborough Corporation, and Wasatch

4    Pacific Investments, LLC (the "Subordinated Lenders"), executed and delivered to JPMorgan

5    Chase a Continuing Subordination and Standstill Agreement dated May 5, 2006 (the

6    "Subordination Agreement"), under the terms of which the Subordinated Lenders subordinated

7    their claims against Woodside Group, PHI, and each of the subsidiaries and affiliates listed in

8    Exhibit A to the Subordination Agreement (the "Borrowing Group") to the payment of amounts

9    due under the Credit Agreement. The Borrowing Group was permitted to make distributions to

10   the Subordinated Lenders (the "Permitted Payments") under the Subordination Agreement,[4] but

11

12

13   _____

14   [4] Section 2 of the Subordination Agreement entitled "Restriction of Payment of Subordinated
     Debt, Disposition of Payments Received by Subordinated Lender," states:

15
         The members of the Borrowing Group will not make, and Subordinated Lender will not
16   accept or receive, any payment or benefit in cash or otherwise (or exercise any right of, or
     permit any set-off with respect to, the Subordinated Debt), directly or indirectly, on
17   account of any amounts owing on the Subordinated Debt, provided, however, the
     members of the Borrowing Group may make, and the Subordinated Lender may accept,
18   Permitted Payments (hereinafter defined), if and only if at the time of each Permitted
     Payment and both before and after giving effect thereto (a) no Default or Event of Default
19   under the Senior Credit Agreement shall have occurred and be continuing, and (b) the
     members of the Borrowing Group will remain in compliance with the covenants set forth
20   in Section 5.3 of the Senior Credit Agreement. As used herein a "Permitted Payment"
     means (i) payments of accrued interest owing on the Subordinated Debt and (ii) payments
21   (including prepayments) of principal, in each case solely out of monies which the
     members of the Borrowing Group are otherwise entitled to distribute to their respective
22   members, partners or shareholders pursuant to Section 6.6 of the Senior Credit
     Agreement. The members of the Borrowing Group agree that each Permitted Payment
23   made to the Subordinated Lender shall reduce dollar for dollar the amount available for
     distribution to members, partners and shareholders of the members of the Borrowing
24   Group pursuant to Section 6.6.

25
     Ex. 2, at 3 (emphasis in original).
26

27

1   only if no default existed or had occurred under the Credit Agreement.[5]  As of March 31, 2008,

2   approximately $314 million in principal was outstanding under the Credit Agreement.

3      2. Noteholder Debt

4      The operations of Woodside Group were also financed through capital raised by PHI

5   under the terms of four Note Purchase Agreements dated September 16, 2003, May 25, 2004,

6   July 7, 2005, and March 28, 2006 (the "Noteholder Debt").  The Noteholder Debt is owed to

7   Metropolitan Life Insurance Company, Security Life of Denver Insurance Company, AXA

8   Equitable Life Insurance Company, John Hancock Life Insurance Company, and New York Life

9   Insurance Company (the "Noteholder Group").  PHI's obligations on account of the Noteholder

10  Debt are unsecured, but are guaranteed by Woodside Group and the Restricted Subsidiaries.  As

11  of March 31, 2008, approximately $372 million in principal was owed on the Noteholder Debt.

12  _____

13  [5] Section 6.6 of the Credit Agreement entitled "Restricted Payments," states:

14      The members of the Borrowing Group will not, and will not permit any of their respective
        Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any
15      Restricted Payment, except (a) each member of the Borrowing Group may declare and
        pay dividends with respect to its Equity Interests payable solely in additional shares of its
16      common stock, (b) Unrestricted Subsidiaries may declare and pay dividends ratable with
        respect to their Equity Interests, (c) each member of the Borrowing Group may make
17      Restricted Payments pursuant to and in accordance with stock option plans or other
        benefit plans for management or employees of the members of the Borrowing Group,
18      except as would otherwise cause a Change in Control, and (d) each member of the
        Borrowing Group may make Restricted Payments to the owners of Equity Interests in
19      such member, so long as both before and after giving effect to each such distribution no
20      Default or Event of Default shall occur and the members of the Borrowing Group shall
        continue to be in compliance with all of the financial covenants set forth in Section 5.3.
21

22  Ex. 1, at 64 (emphasis in original).  "Restricted Payment," as defined in § 1.1 of the Credit
23  Agreement, "means any dividend or other distribution (whether in cash, securities or other
    property) with respect to any Equity Interests in a member of the Borrowing Group, or any
24  payment (whether in cash, securities or other property), including any sinking fund or similar
25  deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or
    termination of any such Equity Interests in such member of the Borrowing Group or any option,
26  warrant or other right to acquire any such Equity Interests in such Person. Ex. 1, at 20 (emphasis
    in original).

27

1       3. <u>Zion's Credit Facility</u>

2       The Unrestricted Subsidiaries were not borrowers or guarantors of either the debt owing

3  to the Bank Group or the Noteholder Group. However, the operations of certain Unrestricted

4  Subsidiaries – Victory Holdings, LLC; Atherton Construction, LLC; Walnut Creek

5  Development, LLC; and Danville Investments, LLC (the "Zions Borrowers") – were funded by a

6  $130 million revolving line of credit facility provided by Zions First National Bank ("Zions").

7  The Zions credit facility was guaranteed by two entities affiliated with Woodside Group:

8  Wasatch Pacific Investments, LLC and Victory Land Investments, LLC (the "Zions Guarantors").

9  D.    <u>Default Under JPMorgan Chase's Credit Agreement & The Noteholder Debt</u>

10       Section 5.1.6 of the Credit Agreement required PHI to execute and deliver to JPMorgan

11  Chase a monthly statement certifying the value of the borrowing base, as calculated pursuant to §

12  2.20 of the Credit Agreement, as of the end of the preceding month (the "Borrowing Base

13  Certificate"). In certifying the amount of the borrowing base, the value that PHI was permitted to

14  attribute to Entitled Land, Lots Under Development, and Finished Lots, according to § 2.20.9(a)

15  of the Credit Agreement, could not exceed 60% of the entire borrowing base at the time of

16  determination. However, PHI's monthly Borrowing Base Certificates submitted to JPMorgan

17  Chase consistently failed to properly account for this 60% limitation in violation of § 2.20.9(a) of

18  the Credit Agreement. PHI's mischaracterization of the borrowing base continued through

19  February 2007, when it tendered a Borrowing Base Certificate to JPMorgan Chase reporting a

20  borrowing base of $748,277,046 for the period ending January 31, 2007, when, in fact, the

21  borrowing base was only $633,006,520. By then, PHI was overdrawn by $78,487,921 and,

22  therefore, the Borrowing Group was in default under § 6.1(a) of the Credit Agreement.

23       PHI was also required to tender to JPMorgan Chase a Compliance Certificate for Pleasant

24  Hill Investments, LC (the "Compliance Certificate") every calendar quarter pursuant to the Credit

25  Agreement. Arave signed and sent Compliance Certificates to JPMorgan Chase on behalf of PHI

26  for the quarters ending December 31, 2006, March 31, 2007, June 30, 2007, and September 30,

27

1    2007, certifying that PHI, Woodside Group, and the Restricted Subsidiaries were in full

2    compliance with all financial covenants and reporting requirements under the Credit Agreement,

3    and that no default or event of default had occurred or was continuing.[6]  By virtue of PHI's

4    ongoing violation of the 60% limitation contained in § 2.20.9(a) of the Credit Agreement, PHI's

5    representations in the Compliance Certificates created a further event of default under § 7.1.3 of

6    the Credit Agreement.[7]

7        When the Borrowing Group's default continued through October 24, 2007, JPMorgan

8    Chase and the Borrowing Group executed a Forbearance Agreement dated October 24, 2007,

9    under the terms of which the Borrowing Group acknowledged that it had "failed to comply with

10   the covenants required under Sections 2.20.9(a) and 6.1(a) of the Credit Agreement," that such

11   acts or omissions were "Defaults or Events of Default under the Credit Agreement," and that by

12   virtue of such existing defaults the Bank Group was "entitled to, among other things, to enforce

13   their rights and remedies under the Credit Agreement and otherwise at law or in equity,

14   including, without limitation, the right to terminate the Commitments and accelerate the

15   Obligations."[8]  However, JPMorgan Chase agreed to forbear from enforcing its rights and

16

17   _____

     [6] Ex. 27.

18   [7] Section 7.1.3 of the Credit Agreement entitled "Representations and Warranties," states:

19
20       Any representation or warranty made or deemed made by or on behalf of a member of the
         Borrowing Group or any Restricted Subsidiary in or in connection with this Agreement or
21       any amendment or modification hereof or waiver hereunder, or in any report, certificate,
         financial statement or other document furnished pursuant to or in connection with this
22       Agreement or any amendment or modification hereof or waiver hereunder, shall prove to
         have been materially incorrect when made or deemed made.
23

24   Ex. 1, at 68.  Arave testified that he made the representations in each Compliance Certificate
     notwithstanding the fact that he had done nothing to determine if the borrowing base complied
25   with the 60% limitation contained in § 2.20.9(a) of the Credit Agreement. Ex. 194, at 173:8-
     174:9.
26
     [8] Ex. 4, at 1, §§ D & E.
27

1   remedies until November 19, 2007. On December 19, 2007, JPMorgan Chase and the Borrowing

2   Group executed a Second Forbearance Agreement, extending the forbearance until February 19,

3   2008, but the parties failed to reach a consensus for a forbearance beyond that date.

4           By virtue of cross-default provisions, the Borrowing Group's default under JPMorgan

5   Chase's Credit Agreement triggered defaults under the Noteholder Debt instruments. Over the

6   months that followed, the Noteholder Group's advisors, FTI Consulting, Inc. ("FTI") were given

7   access to Woodside Group's books and records, its management, its financial advisors, Alvarez

8   & Marsal ("A&M"), and its restructuring counsel, Pachulski Stang Ziehl & Jones, LLP

9   ("Pachulski, Stang"). However, Woodside Group and the Noteholder Group were unable to

10  reach an agreement regarding forbearance. As negotiations with the Bank Group and the

11  Noteholder Group toward a consensual resolution continued into August 2008, Woodside Group

12  agreed to continued to operate within certain budgets and to provide financial reporting to FTI.

13  E.      The Voluntary Petitions of Woodside AMR 107, Inc. & Woodside Portofino, Inc.

14          On March 31, 2008, Woodside AMR 107, Inc. ("AMR 107") and Woodside Portofino,

15  Inc. ("Portofino"), two of Woodside Group's Restricted Subsidiaries, filed voluntary petitions

16  under chapter 11 of the Code.[9] Woodside Group viewed the filings as a necessary step to

17  implementing any global restructuring of its debt obligations that resulted from the ongoing

18  settlement negotiations with the Bank Group and Noteholder Group.[10] The Bank Group and

19  _____

20  [9] Woodside AMR 107, Inc. filed a voluntary chapter 11 petition in Case No. 6:08-bk-13394-PC,
    and Woodside Portofino, Inc. filed a voluntary chapter 11 petition in Case No. 6:08-bk-13396-
21  PC.

22  [10] Indeed, AMR 107 and Portofino contemplated the possibility of bankruptcy filings by other
23  Woodside Entities, stating in the Debtors' Chapter 11 Preliminary Status Report filed in each
    case on July 3, 2008:
24

25          The Debtors and their related entities are currently in the process of entering into
            negotiations with the Bank Group and with the holders of the Noteholder Debt
26          ("Noteholders") in efforts to consensually work out a longer-term, global restructuring of
            these debt obligations and obviate, to the extent possible, the need for the other Woodside
27

1    Noteholder Group took an entirely different view, considering the filings as preemptive and

2    inconsistent with good faith negotiations.  In response thereto, the Bank Group accelerated

3    approximately $335 million due under the Credit Agreement and the Noteholder Group

4    accelerated nearly $372 million due on the Noteholder Debt.  Notwithstanding the filing of the

5    two chapter 11 cases, however, the Bank Group and Noteholder Group continued negotiations

6    with Woodside Group toward a long-term restructuring of the indebtedness.

7    F.    Default Under the Zion's Credit Facility

8        Woodside Group also defaulted under the Zions credit facility in late 2007.  On or about,

9    April 8, 2008, Zions issued a notice of default under its credit facility of approximately $130

10   million.  In June 2008, Zions filed suit in Utah state court against the Zions Borrowers and Zions

11   Guarantors to enforce the provisions of its loan agreement which required the collateralization of

12   its outstanding debt obligations upon the occurrence of certain defaults.  At that time, it was

13   discovered that seven properties that were part of the Zions' borrowing base were, in fact, owned

14   by certain Restricted Subsidiaries that were not parties to the Zions' credit facility.  On August

15   19, 2008, a stipulation was executed with Zions under the terms of which Zions received two

16   deeds of trust executed by Zions Borrowers, Walnut Creek Development, LLC and Danville

17   Land Investments, LLC, respectively, to secure the approximately $128 million then owing to

18

19        Group entities to file bankruptcy proceedings.  It remains undetermined whether a global
20   restructuring is susceptible of implementation outside of a chapter 11 plan process.  If
     further filings become necessary, the Debtors' affiliated entities and their professionals
21   will work with the Bankruptcy Court and the Office of the United States Trustee to
22   implement such filings in an organized and systematic manner . . . .

23        The Debtors seek to enter into a consensual global restructuring with all
     constituent members of the Bank Group and the Noteholders.  To the extent a significant
24   majority but not all members of the Bank Group and the Noteholders support a
     restructuring plan, the Debtors may seek to confirm a plan under Section 1129(b) of the
25   Bankruptcy Code as to those non-consenting members.
26
     Id. at 3:21-4:11 (emphasis in original).
27
                                    - 10 -

1   Zions. Title to the seven properties was transferred from the Restricted Subsidiaries to certain

2   Unrestricted Subsidiaries, without the knowledge or consent of the Bank Group, for the purpose

3   of "truing up" ownership of the properties forming the Zions' borrowing base. In consideration

4   therefor, Zions dismissed the state court action and agreed to forbear from exercising its rights

5   and remedies against the Zions Borrowers and Zions Guarantors.

6   G.      Woodside Group's Dividends to Shareholders

7           From its inception until July 25, 2008, Woodside Group was a Nevada corporation that

8   had elected to be treated as a subchapter S corporation under the Internal Revenue Code.[11]  As a

9   qualified subchapter S corporation, Woodside Group was a "pass through" entity for income tax

10  purposes, i.e., the income and losses of the corporation were attributed directly to its

11  shareholders. Woodside Group's subsidiaries were also organized as qualified subchapter S

12  corporations or as limited liability companies. With respect to dividends, Woodside Group's

13  stated policy was that it was "under no obligation to issue dividends or distributions" and that it

14  expected to "retain most or all income for additional investment opportunities."[12]  However, it

15  ───────────────────────

16  [11] 26 U.S.C. § 1, et seq.

17  [12] For example, Woodside Group's Confidential Disclosure and Limited Offering Memorandum
    dated January 13, 2006 ("2006 Offering Memo"), states:
18

19      • **We Do Not Intend to Pay Significant Distributions or Dividends**. We currently
        intend to retain any future earnings to fund growth and, therefore, do not expect to pay
20      any dividends or distributions in the foreseeable future, except as the Companies may
        elect in order to assist the Shareholders/Members to pay the income of the Companies
21      attributable to them under the tax laws.

22  Ex. 45, at 9. The 2006 Offering Memo further states:

23
        Dividends and Distributions. [T]he Companies are under no obligation to issue dividends
24      or distributions. It is anticipated that the Companies will retain most or all income for
        additional investment opportunities. If the Companies recognize income for tax
25      purposes, the income is attributable to its members in proportion to their membership
        interests. The Companies may issue a distribution for the purpose of assisting its
26      Members with their tax obligations related to the attributed income, but the Companies

27                                              - 11 -

1  was Woodside Group's practice to declare dividends and make regular distributions to its

2  shareholders for the purpose of providing them cash to pay the portion of their federal and state

3  income taxes attributable to Woodside Group's income.  Because shareholders of subchapter S

4  corporations must receive equal pro rata distributions, Woodside Group fixed the amount of each

5  periodic dividend by calculating the highest potential tax liability of any single shareholder using

6  an assumed federal income tax rate of 35% and California's income tax rate of 9.3%.  Woodside

7  Group then estimated its gross taxable income, applied the projected maximum tax rate of

8  44.3%, and directed PHI to disburse the dividends to shareholders.  Cash dividends generally

9  were accompanied by a letter advising the shareholder that the funds were "to assist you in

10  paying your taxes . . . on the income from Woodside Group, Inc. and Pleasant Hill Investments,

11  LC, as well as a return on your investment."[13]  However, notwithstanding the timing and amount

12  of each dividend, there was no restriction on how the money was to be used.  Distributions to

13  Nilson, Arave, and various other members of Nilson's family or their trusts were not paid in

14  cash, but were treated by the company as payments on a "shareholder note" and then disbursed to

15  cover the particular shareholder's checks and wire transfers to taxing authorities.  Senior

16
17  are under no obligation to do so.  Since the formation of the Companies, dividends and
    distributions have typically been limited to certain amounts calculated on an equal basis
18  to assist owners in the Companies to pay the income tax on that portion of the
    Companies' income attributable to them.  There is no guarantee that any such
19  distribution, if they occur, will in fact compensate for the tax liability incurred by each
    owner due to ownership in the Companies.
20
21  Id. at 20 (emphasis added).  Finally, the 2006 Offering Memo cautioned:

22  • **No Significant Tax Benefits**.  Investment in the Shares and Units is not expected to
    yield any significant tax benefits to the Shareholders/Members.  The purpose of the
23  Company is to generate economic profits, taxable as ordinary income, from the proceeds
    received from the business operations of the Companies.
24
25  Id. at 24.  Woodside Group made similar disclosures in its Confidential Disclosure and Limited
    Offering Memorandum dated January 19, 2007.  Ex. 46, at 9, 20 & 23.
26
27  [13] Ex. 160, at 5.

-12-

1  management consisting of Nilson, Nelson, and Arave, together with their extended families and

2  their family trusts, constituted approximately 97% of the dividend distributions to shareholders.

3  Woodside Group declared and distributed $234 million in dividends to shareholders in 2006 and

4  2007 primarily for payment of their maximum estimated taxes.[14]  Dividends were paid by

5  Woodside Group as late as May 9, 2008,[15] notwithstanding the existing defaults to the Bank

6  Group and Noteholder Group and the pending bankruptcies of AMR 107 and Portofino.

7  H.    The Corporate Restructuring

8      On July 25, 2008, Woodside Group consummated a restructuring under which Woodside

9  Group, Inc., a subchapter S corporation, was converted to Woodside Group, LLC, a limited

10  liability company.  As part of the restructuring, about 105 Restricted Subsidiaries, including

11  AMR 107 and Portofino, were converted from subchapter S corporations and merged into at least

12  10 new limited liability companies or partnerships, and another 13 corporations affiliated with

13  Woodside Group were converted into limited liability companies (the "Corporate

14  Restructuring").  The Corporate Restructuring was undertaken by senior management without

15  disclosure to the Bank Group, Noteholder Group, or the court in the AMR 107 and Portofino

16  _____

17  [14]  The minutes of meetings of Woodside Group's Board of Directors state the following
distributions were authorized as dividends to shareholders in 2006 and 2007:

18
        January 11, 2006          $62,007,678.60
19      April 13, 2006             46,612,863.00
        June 15, 2006              29,408,479.02
20      September 15, 2006         26,089,235.48
        September 20, 2006         13,974,120.60
21      September 21, 2006          9,739,538.60
22      April 12, 2007             18,445,429.08
        June 12, 2007              14,807,110.50
23      September 12, 2007         12,691,809.90
                                  $233,776,264.78
24

25  Ex. 30, at 1-14.

26  [15]  Woodside Group's Board of Directors authorized a distribution to shareholders of dividends
totaling $254,425 on May 9, 2008. Ex. 30, at 15.
27

- 13 -

1   chapter 11 cases.[16]  Indeed, Woodside Group's senior management kept the Corporate

2   Restructuring a secret from its own restructuring professionals, A&M and Pachulski, Stang, by

3   privately retaining, at Woodside Group's expense, the accounting firm of Ernst & Young and the

4   law firm of Parr Waddoups Brown Gee & Loveless ("Parr Waddoups") to create and implement

5   the plan of conversion.

6        For tax purposes, the Corporate Restructuring enabled Woodside Group to write down

7   the value of its assets to $1.28 billion – the estimated amount of Woodside Group's debt to third

8   parties, plus approximately $330 million of intercompany debt owed to PHI – to trigger a loss of

9   approximately $500 million.  Due to the "pass-through" nature of subchapter S corporations, the

10  tax loss generated by the Corporate Restructuring flowed directly to Woodside Group's

11  shareholders.  The Corporate Restructuring's primary purpose was to permit Woodside Group's

12  shareholders to secure the write-down, apply their respective portions of the write-down to

13  taxable income recognized in 2006 and 2007, and to receive state and federal tax refunds

14  collectively exceeding $110 million.

15       On August 15, 2008, the Noteholder Group discovered Woodside Group's undisclosed

16  Corporate Restructuring plan as it was being executed.  With the discovery, the Bank Group and

17  Noteholder Group concluded that they could no longer trust Woodside Group's senior

18  management to negotiate in good faith an out-of-court restructuring of its obligations to the

19  parties.

20  I.      The Involuntary Petitions

21       On August 20, 2008, the Noteholder Group filed an involuntary petition against

22  Woodside Group under chapter 11 of the Code.  Between August 20, 2008, and August 22, 2008,

23  the Noteholder Group filed similar involuntary petitions against 184 of Woodside Group's

24

25  _____

26  [19]  The Corporate Restructuring included a transfer AMR 107 and Portofino into a new entity,
    WDS Holdings, Inc., a wholly-owned subsidiary of Woodside Group.  Ex. 183.

27

- 14 -

1  subsidiaries and affiliates.[17]

2
————————————

3  [17] The Noteholder Group's involuntary petitions targeted not only Woodside Group, but the
following 184 Restricted Subsidiaries: (1) BCD 99, LLC, Case No. 6:08-bk-20690-PC filed on
4  August 20, 2008; (2) Foxboro 50's, LLC, Case No. 6:08-bk-20754-PC filed on August 20, 2008;
(3) Foxboro Coventry, LLC, Case No. 6:08-bk-20755-PC filed on August 20, 2008; (4) Foxboro
5  Estates, LLC, Case No. 6:08-bk-20756-PC filed on August 20, 2008; (5) Foxboro Villages, LLC,
Case No. 6:08-bk-20757-PC filed on August 20, 2008; (6) Ivywood Interior Design, LLC, Case
6  No. 6:08-bk-20758-PC filed on August 20, 2008; (7) Menifee Woodside, LLC, Case No. 6:08-
bk-20714-PC filed on August 20, 2008; (8) MHA 02, LLC, Case No. 6:08-bk-20728-PC filed on
7  August 20, 2008; (9) Monterey Woodside, LLC, Case No. 6:08-bk-20729-PC filed on August 20,
2008; (10) MWG 00, LLC, Case No. 6:08-bk-20730-PC filed on August 20, 2008; (11) MWL
8  01, LLC, Case No. 6:08-bk-20734-PC filed on August 20, 2008; (12) Oquirrh Highlands
Condominiums, LLC, Case No. 6:08-bk-20759-PC filed on August 20, 2008; (13) Pleasant Hill
9  Investments, LC, Case No. 6:08-bk-20686-PC filed on August 20, 2008; (14) Pleasant Valley
Investments, LLC, Case No. 6:08-bk-20760-PC filed on August 20, 2008; (15) Portola
10  Development Company, LLC, Case No. 6:08-bk-20762-PC filed on August 20, 2008; (16)
Portola Development Arizona, LLC, Case No. 6:08-bk-20763-PC filed on August 20, 2008; (17)
11  Portola Development Utah, LLC, Case No. 6:08-bk-20764-PC filed on August 20, 2008; (18)
Saratoga Land Development, LLC, Case No. 6:08-bk-20765-PC filed on August 20, 2008; (19)
12  Sonora HOA Management, LLC, Case No. 6:08-bk-20766-PC filed on August 20, 2008; (20)
Sterling 69, LLC, Case No. 6:08-bk-20767-PC filed on August 20, 2008; (21) TBB 03, LLC,
13  Case No. 6:08-bk-20711-PC filed on August 20, 2008; (22) WDS GP, Inc., Case No. 6:08-bk-
20768-PC filed on August 20, 2008; (23) WDS Holdings, Inc., Case No. 6:08-bk-20688-PC filed
14  on August 20, 2008; (24) WGP Group, LLC, Case No. 6:08-bk-20770-PC filed on August 20,
2008; (25) Woodside 04N, LP, Case No. 6:08-bk-20692-PC filed on August 20, 2008; (26)
15  Woodside 04S, LP, Case No. 6:08-bk-20694-PC filed on August 20, 2008; (27) Woodside 05N,
LP, Case No. 6:08-bk-20699-PC filed on August 20, 2008; (28) Woodside 05S, LP, Case No.
16  6:08-bk-20701-PC filed on August 20, 2008; (29) Woodside 06N, LP, Case No. 6:08-bk-20704-
PC filed on August 20, 2008; (30) Woodside 07N, LP, Case No. 6:08-bk-20706-PC filed on
17  August 20, 2008; (31) Woodside 20/25, LLC, Case No. 6:08-bk-20772-PC filed on August 20,
2008; (32) Woodside Aberdeen, LLC, Case No. 6:08-bk-20774-PC filed on August 20, 2008;
18  (33) Woodside Allerton, LLC, Case No. 6:08-bk-20775-PC filed on August 20, 2008; (34)
Woodside Amberly, LLC, Case No. 6:08-bk-20776-PC filed on August 20, 2008; (35) Woodside
19  Amelia Lakes, LLC, Case No. 6:08-bk-20777-PC filed on August 20, 2008; (36) Woodside
AMR 91, LLC, Case No. 6:08-bk-20744-PC filed on August 20, 2008; (37) Woodside Autumn
20  Ridge, LLC, Case No. 6:08-bk-20735-PC filed on August 20, 2008; (38) Woodside Avalon Park,
LLC, Case No. 6:08-bk-20778-PC filed on August 20, 2008; (39) Woodside Avalon, LLC, Case
21  No. 6:08-bk-20779-PC filed on August 20, 2008; (40) Woodside Ballantrae, LLC, Case No.
6:08-bk-20780-PC filed on August 20, 2008; (41) Woodside Bella Fresca, Inc., Case No. 6:08-
22  bk-20782-PC filed on August 20, 2008; (42) Woodside Berkeley, LLC, Case No. 6:08-bk-20783-
PC filed on August 20, 2008; (43) Woodside Bilby Ranch, Inc., Case No. 6:08-bk-21072-PC
23  filed on August 22, 2008; (44) Woodside Blue Water Bay, LLC, Case No. 6:08-bk-20784-PC

24

25

26

27

1

2  filed on August 20, 2008; (45) Woodside Bridges at Boulder Creek, LLC, Case No. 6:08-bk-
3  20785-PC filed on August 20, 2008; (46) Woodside Brookstone, LLC, Case No. 6:08-bk-20786-
   PC filed on August 20, 2008; (47) Woodside Buffalo Ridge, LLC, Case No. 6:08-bk-20788-PC
4  filed on August 21, 2008; (48) Woodside Cambria, LLC, Case No. 6:08-bk-20789-PC filed on
   August 21, 2008; (49) Woodside Canyon Creek, LLC, Case No. 6:08-bk-20790-PC filed on
5  August 21, 2008; (50) Woodside Casa Palermo, LLC, Case No. 6:08-bk-20791-PC filed on
6  August 21, 2008; (51) Woodside Castleton, LLC, Case No. 6:08-bk-20792-PC filed on August
   21, 2008; (52) Woodside Cedar Creek, LLC, Case No. 6:08-bk-20793-PC filed on August 21,
7  2008; (53) Woodside Clarendon Hills, LLC, Case No. 6:08-bk-20737-PC filed on August 21,
   2008; (54) Woodside Clearwater, LLC, Case No. 6:08-bk-20794-PC filed on August 21, 2008;
8  (55) Woodside Colonial Charles SFD, LLC, Case No. 6:08-bk-20795-PC filed on August 21,
9  2008; (56) Woodside Colonial Charles Villas, LLC, Case No. 6:08-bk-20796-PC filed on August
   21, 2008; (57) Woodside Communities – WDC, LLC, Case No. 6:08-bk-20797-PC filed on
10 August 21, 2008; (58) Woodside Communities of North Florida, LLC, Case No. 6:08-bk-20798-
   PC filed on August 21, 2008; (59) Woodside Cortez Heights, LLC, Case No. 6:08-bk-20799-PC
11 filed on August 21, 2008; (60) Woodside Daytona Land, LLC, Case No. 6:08-bk-20800-PC filed
12 on August 21, 2008; (61) Woodside Eagle Marsh North, LLC, Case No. 6:08-bk-20801-PC filed
   on August 21, 2008; (62) Woodside Eagle Marsh South, LLC, Case No. 6:08-bk-20802-PC filed
13 on August 21, 2008; (63) Woodside Encore at Sunset Ranch, LLC, Case No. 6:08-bk-20803-PC
   filed on August 21, 2008; (64) Woodside Exeter South, LLC, Case No. 6:08-bk-20804-PC filed
14 on August 21, 2008; (65) Woodside Farmington Hollow Cottages, LLC, Case No. 6:08-bk-
   20805-PC filed on August 21, 2008; (66) Woodside Farmington Hollow Estates, LLC, Case No.
15 6:08-bk-20806-PC filed on August 21, 2008; (67) Woodside Farmington Meadows, LLC, Case
16 No. 6:08-bk-20807-PC filed on August 21, 2008; (68) Woodside Fieldstone Ranch, LLC, Case
   No. 6:08-bk-20808-PC filed on August 21, 2008; (69) Woodside Fieldstone, LLC, Case No.
17 6:08-bk-20809-PC filed on August 21, 2008; (70) Woodside Finisterre, LLC, Case No. 6:08-bk-
   20810-PC filed on August 21, 2008; (71) Woodside Foothills Sunrise, LLC, Case No. 6:08-bk-
18 20811-PC filed on August 21, 2008; (72) Woodside Foothills West, LLC, Case No. 6:08-bk-
19 20812-PC filed on August 21, 2008; (73) Woodside Garden Gate, LLC, Case No. 6:08-bk-
   20813-PC filed on August 21, 2008; (74) Woodside Glenmere, Inc. (n/k/a Woodside GM, LLC),
20 Case No. 6:08-bk-20736-PC filed on August 21, 2008; (75) Woodside Grande Premier, LLC,
   Case No. 6:08-bk-20814-PC filed on August 21, 2008; (76) Woodside Greyhawk, LLC, Case No.
21 6:08-bk-20815-PC filed on August 21, 2008; (77) Woodside Grouse Pointe, LLC, Case No.
22 6:08-bk-20816-PC filed on August 21, 2008; (78) Woodside Hearthstone, LLC, Case No. 6:08-
   bk-20817-PC filed on August 21, 2008; (79) Woodside Heritage Lake 129, Inc., Case No. 6:08-
23 bk-20818-PC filed on August 21, 2008; (80) Woodside Heritage Lake 150, Inc., Case No. 6:08-
   bk-20820-PC filed on August 21, 2008; (81) Woodside Heritage Lake 7200, Inc., Case No. 6:08-
24 bk-20821-PC filed on August 21, 2008; (82) Woodside Highland Ridge LLC, Case No. 6:08-bk-
25 20825-PC filed on August 21, 2008; (83) Woodside Homes Corporation, Case No. 6:08-bk-
   20827-PC filed on August 21, 2008; (84) Woodside Homes of Arizona, Inc., Case No. 6:08-bk-
26 20830-PC filed on August 21, 2008; (85) Woodside Homes of California, Inc., Case No. 6:08-
   bk-20832-PC filed on August 21, 2008: (86) Woodside Homes of Central California, Inc., Case
27

No. 6:08-bk-20834-PC filed on August 21, 2008; (87) Woodside Homes of Florida, LLC, Case No. 6:08-bk-20837-PC filed on August 21, 2008; (88) Woodside Homes of Fresno, Inc., Case No. 6:08-bk-20840-PC filed on August 21, 2008; (89) Woodside Homes of Minnesota, Inc., Case No. 6:08-bk-20842-PC filed on August 21, 2008; (90) Woodside Homes of Nevada, Inc., Case No. 6:08-bk-20843-PC filed on August 21, 2008; (91) Woodside Homes of Northern California, Inc., Case No. 6:08-bk-20844-PC filed on August 21, 2008; (92) Woodside Homes of Reno, LLC, Case No. 6:08-bk-20845-PC filed on August 21, 2008; (93) Woodside Homes of South Texas, LLC, Case No. 6:08-bk-20846-PC filed on August 21, 2008; (94) Woodside Homes of Southeast Florida, LLC, Case No. 6:08-bk-20847-PC filed on August 21, 2008; (95) Woodside Homes of Southern California, LLC, Case No. 6:08-bk-20742-PC filed on August 20, 2008; (96) Woodside Home Sales Corp., Case No. 6:08-bk-20850-PC filed on August 21, 2008; (97) Woodside Hunters Creek, LLC, Case No. 6:08-bk-20852-PC filed on August 21, 2008; (98) Woodside Jackrabbit Estates, LLC, Case No. 6:08-bk-20855-PC filed on August 21, 2008; (99) Woodside Karston Cove, LLC, Case No. 6:08-bk-20861-PC filed on August 21, 2008; (100) Woodside Kinder Ranch, LLC, Case No. 6:08-bk-20864-PC filed on August 21, 2008; (101) Woodside Knoll Creek, LLC, Case No. 6:08-bk-20866-PC filed on August 21, 2008; (102) Woodside Land Holdings, LLC, Case No. 6:08-bk-20868-PC filed on August 21, 2008; (103) Woodside Las Colinas, LLC, Case No. 6:08-bk-20869-PC filed on August 21, 2008; (104) Woodside Legacy Oaks, LLC, Case No. 6:08-bk-20871-PC filed on August 21, 2008; (105) Woodside Legacy, LLC, Case No. 6:08-bk-20738-PC filed on August 20, 2008; (106) Woodside Madison Colony, LLC, Case No. 6:09-bk-20872-PC filed on August 21, 2008; (107) Woodside Magma Ranch, LLC, Case No. 6:08-bk-20874-PC filed on August 21, 2008; (108) Woodside Majestic Oaks, LLC, Case No. 6:08-bk-20875-PC filed on August 21, 2008; (109) Woodside Meadows of Big Lake, LLC, Case No. 6:08-bk-20877-PC filed on August 21, 2008; (109) Woodside Menifee 105, Inc., Case No. 6:08-bk-20879-PC filed on August 21, 2008; (110) Woodside Montecatini, Inc., Case No. 6:08-bk-21073-PC filed on August 22, 2008; (111) Woodside Montrose, Inc., Case No. 6:08-bk-20881-PC filed on August 21, 2008; (112) Woodside Murabella, LLC, Case No. 6:08-bk-20882-PC filed on August 21, 2008; Woodside North MPLS, LLC, Case No. 6:08-bk- 20883-PC filed on August 21, 2008; (113) Woodside Northridge, LLC, Case No. 6:08-bk-20885-PC filed on August 21, 2008; (114) Woodside Palmilla, LLC, Case No. 6:08-bk-20886-PC filed on August 21, 2008; (115) Woodside Palomar, LLC, Case No. 6:08-bk-20893-PC filed on August 21, 2008; (116) Woodside Park Paseo, LLC, Case No. 6:08-bk-20895-PC filed on August 21, 2008; (117) Woodside Parkview, LLC, Case No. 6:08-bk-20899-PC filed on August 21, 2008; (118) Woodside Paseo 5000, LLC, Case No. 6:08-bk-20746-PC filed on August 20, 2008; (119) Woodside Paseo 6000, LLC, Case No. 6:08-bk-20748-PC filed on August 20, 2008; (120) Woodside Paseo 7200, LLC, Case No. 6:08-bk-20750-PC filed on August 20, 2008; (121) Woodside Pebble Creek, LLC, Case No. 6:08-bk-20901-PC filed on August 21, 2008; (122) Woodside Preserve at Boulder Creek, LLC, Case No. 6:08-bk-20905-PC filed on August 21, 2008; (123) Woodside Provence, LLC, Case No. 6:08-bk-20906-PC filed on August 21, 2008; (124) Woodside Quail Crossing, LLC, Case No. 6:08-bk-20909-PC filed on August 21, 2008; (125) Woodside Rio Vista, LLC, Case No. 6:08-bk-20912-PC filed on August 21, 2008; (126) Woodside Riverwalk Preserve, LLC, Case No. 6:08-bk-

- 17 -

1

2   20915-PC filed on August 21, 2008; (127) Woodside Rocking Horse, LLC, Case No. 6:08-bk-
3   20916-PC filed on August 21, 2008; (128) Woodside Rockwell, LLC, Case No. 6:08-bk-20923-
    PC filed on August 21, 2008; (129) Woodside Rocky Pen, LLC, Case No. 6:08-bk-20927-PC
4   filed on August 21, 2008; (130) Woodside Rogers Ranch, LLC, Case No. 6:08-bk-20937-PC
    filed on August 21, 2008; (131) Woodside Rosewood, LLC, Case No. 6:08-bk-20939-PC filed
5   on August 22, 2008; (132) Woodside Royal Meadows, LLC, Case No. 6:08-bk-20940-PC filed
6   on August 22, 2008; (133) Woodside S.O., LLC, Case No. 6:08-bk-20941-PC filed on August
    22, 2008; (134) Woodside Scotland Heights, LLC, Case No. 6:08-bk-20942-PC filed on August
7   22, 2008; (135) Woodside Sienna, LLC, Case No. 6:08-bk-20943-PC filed on August 22, 2008;
    (136) Woodside Solano, LLC, Case No. 6:08-bk-20944-PC filed on August 22, 2008; (137)
8   Woodside Somerset, LLC, Case No. 6:08-bk-20945-PC filed on August 22, 2008; (138)
9   Woodside South Brook, LLC, Case No. 6:08-bk-20946-PC filed on August 22, 2008; (139)
    Woodside Southern Hills, LLC, Case No. 6:08-bk-20947-PC filed on August 22, 2008; (140)
10  Woodside Southridge, LLC, Case No. 6:08-bk-20948-PC filed on August 22, 2008; (141)
    Woodside Springs at Boulder Creek, LLC, Case No. 6:08-bk-20949-PC filed on August 22,
11  2008; (142) Woodside Stonehaven, LLC, Case No. 6:08-bk-20950-PC filed on August 22, 2008;
12  (143) Woodside Stoneybrook, LLC, Case No. 6:08-bk-20951-PC filed on August 22, 2008; (144)
    Woodside Summerwood, LLC, Case No. 6:08-bk-20952-PC filed on August 22, 2008; (145)
13  Woodside Summit at Foothills Reserve, LLC, Case No. 6:08-bk-20953-PC filed on August 22,
    2008; (146) Woodside Summit at Riverwalk, LLC, Case No. 6:08-bk-20954-PC filed on August
14  22, 2008; (147) Woodside Sunrise at Riverwalk, LLC, Case No. 6:08-bk-20955-PC filed on
15  August 22, 2008; (148) Woodside Sunset Farms, LLC, Case No. 6:08-bk-20956-PC filed on
    August 22, 2008; (149) Woodside Talaverde, LLC, Case No. 6:08-bk-20958-PC filed on August
16  22, 2008; (150) Woodside Tampa Palms, LLC, Case No. 6:08-bk-20959-PC filed on August 22,
    2008; (152) Woodside Tempe Village, LLC, Case No. 6:08-bk-20960-PC filed on August 22,
17  2008; (153) Woodside Texas Holdings, LLC, Case No. 6:08-bk-20962-PC filed on August 22,
18  2008; (154) Woodside Texas Land Holdings, LLC, Case No. 6:08-bk-20963-PC filed on August
    22, 2008; (155) Woodside Thurnbeck, LLC, Case No. 6:08-bk-20964-PC filed on August 22,
19  2008; (156) Woodside Tierra Verde 301, LLC, Case No. 6:08-bk-20965-PC filed on August 22,
    2008; (157) Woodside Timberlake, LLC, Case No. 6:08-bk-20969-PC filed on August 22, 2008;
20  (158) Woodside Trails North at Horsemans Park, LLC, Case No. 6:08-bk-20972-PC filed on
    August 22, 2008; (160) Woodside Triana, LLC, Case No. 6:08-bk-20975-PC filed on August 22,
21  2008; (161) Woodside Trillium, LLC, Case No. 6:08-bk-20979-PC filed on August 22, 2008;
22  (162) Woodside Trinity Oaks 55, LLC, Case No. 6:08-bk-20985-PC filed on August 22, 2008;
    (163) Woodside Trinity Oaks 65, LLC, Case No. 6:08-bk-20981-PC filed on August 22, 2008;
23  (164) Woodside Tuscan Oaks, LLC, Case No. 6:08-bk-20995-PC filed on August 22, 2008;
    (165) Woodside Two Creeks 50, LLC, Case No. 6:08-bk-21002-PC filed on August 22, 2008;
24  (166) Woodside Two Creeks 65, LLC, Case No. 6:08-bk-21007-PC filed on August 22, 2008;
25  (167) Woodside Two Creeks Villas, LLC, Case No. 6:08-bk-21008-PC filed on August 22, 2008;
    (168) Woodside Valencia, LLC, Case No. 6:08-bk-21012-PC filed on August 22, 2008; (169)
26  Woodside Via Valencia, LLC, Case No. 6:08-bk-21013-PC filed on August 22, 2008; (170)
    Woodside Via Ventura, Case No. 6:08-bk-21016-PC filed on August 22, 2008; (171) Woodside
27

1  The Bank Group immediately joined as a petitioner in each of the involuntary petitions. On

2  September 3, 2008, the court ordered that the 185 cases be jointly administered with AMR 107

3  and Portofino under Case No. 6:08-bk-20682-PC, Woodside Group, LLC, et al. On September

4  16, 2008, Woodside Group and the targeted subsidiaries and affiliates filed a consolidated

5  answer to the involuntary petitions and consented to entry of an order for relief in each of the 185

6  cases.

7         On December 19, 2008, Woodside Ceramista City, LLC filed a voluntary chapter 11

8  petition in Case No. 6:08-bk-28171-PC and Woodside Ceramista Village, LLC filed a voluntary

9  chapter 11 petition in Case No. 6:08-bk-28168-PC. None of the Unrestricted Subsidiaries are

10  debtors in bankruptcy except Alameda Investments, LLC which filed a voluntary chapter 11

11  petition in Case No. 6:09-bk-10348-PC on January 9, 2009, and Liberty Holdings Group, LLC

12  which filed a voluntary chapter 11 petition in Case No. 6:09-bk-13484-PC on February 26, 2009.

13  Woodside Ceramista City, Woodside Ceramista Village, Alameda Investments, and Liberty

14  Holdings Group are jointly administered with the other Woodside Entities under Case No. 6:08-

15  bk-20682-PC, Woodside Group, LLC, et al.

16

17  ——————————————

18  Vicinato, LLC, Case No. 6:08-bk-21017-PC filed on August 22, 2008; (172) Woodside Villa
Palazzo, LLC, Case No. 6:08-bk-21018-PC filed on August 22, 2008; (173) Woodside Villa

19  Palermo, LLC, Case No. 6:08-bk-21022-PC filed on August 22, 2008; (174) Woodside Vista
Montana, LLC, Case No. 6:08-bk-20751-PC filed on August 20, 2008; (175) Woodside Walden,

20  LLC, Case No. 6:08-bk-21024-PC filed on August 22, 2008; (176) Woodside Watson 308, LLC,
Case No. 6:08-bk-21030-PC filed on August 22, 2008; (177) Woodside Weston Ranch, LLC,

21  Case No. 6:08-bk-20753-PC filed on August 20, 2008; (178) Woodside Wildwood, LLC, Case

22  No. 6:08-bk-21035-PC filed on August 22, 2008; (179) Woodside Willowbrook, LLC, Case No.
6:08-bk-21036-PC filed on August 22, 2008; (180) Woodside Wolf Creek 121, Inc., Case No.

23  6:08-bk-21068-PC filed on August 22, 2008; (181) Woodside Wolf Creek 126, Inc, Case No.
6:08-bk-21069-PC filed on August 22, 2008; (182) Woodside Wolf Creek 133, Inc., Case No.

24  6:08-bk-21070-PC filed on August 22, 2008; (183) Woodside Wolf Creek 138, Inc., Case No.

25  6:08-bk-21071-PC filed on August 22, 2008; and (184) Woodside Wolf Creek 77, Inc., Case No.
6:08-bk-21074-PC filed on August 22, 2008.

26

27

J.     Relevant Events During Bankruptcy

On October 2, 2008, the Committee was appointed consisting of JPMorgan Chase, Bank of America, N.A., Wachovia Bank, National Association, John Hancock Life Insurance Company, MetLife Inc. & Affiliates, AXA Equitable Life Insurance Company, and Travelers Casualty & Surety Co. of America.  Shortly before appointment of the Committee, the Noteholder Group on September 18, 2008, filed a motion seeking the appointment of a trustee or, alternatively, an examiner pursuant to § 1104.  On November 3, 2008, the court denied the Noteholder Group's request for a trustee, but ordered the appointment of an examiner pursuant to § 1104(c).  On November 19, 2008, the court approved the appointment of Paul S. Aronzon ("Aronzon"), as examiner, to investigate the financial affairs of Woodside Group and to report:

1.     Whether Woodside Group or its creditors have any cognizable claims against Woodside Group's senior managers and/or its shareholders, including but not limited to, any claim for breach of fiduciary duty, attributable to the conversion of Woodside Group, Inc. from a subchapter S corporation to a limited liability company on July 25, 2008, which triggered a write down of its remaining assets by approximately $500 million, including the question of whether the acceleration of loss triggered by the Woodside conversion on July 25, 2008, should be unwound before December 31, 2008, to reinstate and preserve a basis of approximately $500 million in the assets of Woodside Group; and

2.     Whether Woodside Group or its creditors have any cognizable claim against the shareholders with respect to the original distributions made to shareholders in 2006 and 2007 in order to pay the shareholders' "pass through" tax liabilities.[18]

On December 15, 2008, Aronzon filed his Statement of Investigation Conducted by Examiner Paul S. Aronzon (the "Examiner's Report") containing the results of his investigation together with his findings and conclusions.  In response thereto, the Committee filed a motion seeking to expand Aronzon's powers as examiner to investigate and pursue, among other things, claims against Woodside Group's shareholders to recover tax distributions and refunds, and potential breaches of fiduciary duty allegedly committed by Woodside Group's senior management.

On February 13, 2009, the court approved a stipulation between Woodside Group and the Committee under the terms of which the Committee agreed to withdraw its motion to expand

---

[18] Ex. 101, at 2:3-9.

- 20 -

1  Aronzon's authority without prejudice. In consideration therefor, Woodside Group agreed, in

2  pertinent part, that "pending the effective date of any plan of reorganization that retains the Estate

3  Causes of Action to (or revests the Estate Causes of Action in) the reorganized debtors or any

4  litigation trust, the Committee shall be authorized, on behalf of [Woodside Group], to

5  investigate, prosecute and, subject to approval of this Court, settle the Estate Causes of Action."[19]

6      On November 25, 2009, an order was entered confirming the Second Amended Joint Plan

7  of Reorganization of Woodside Group, LLC and Affiliated Debtors, as Modified, on November

8  24, 2009 (the "Plan"). The Plan provides for, among other things, a litigation trust. The

9  effective date of the Plan was December 31, 2009.

10  K.    JPMorgan Chase's Complaint

11      On September 18, 2008, JPMorgan Chase filed a Complaint for Injunctive Relief against

12  Woodside Group and its shareholders in Adversary No. 6:08-ap-01359-PC, styled JPMorgan

13  Chase Bank, N.A. v. Woodside Group, LLC, et al., seeking to enjoin them from taking further

14  action to consummate the Corporate Restructuring. On September 23, 2008, the court issued a

15  temporary restraining order against Woodside Group and its shareholders, together with an order

16  to show cause why a preliminary injunction should not be entered. On October 2, 2008, the court

17  approved a Stipulation to Entry of Agreed Upon Temporary Restraining Order pursuant to which

18  Woodside Group and certain named defendants agreed not to take further action to consummate

19  the Corporate Restructuring and tax event triggered by the reorganization pending further order

20  of the court.

21

22  [19] Order Approving Stipulation Resolving Potential Objections to (A) the Motion of the Debtors
23  Seeking Approval of Certain Solicitation Procedures and (B) the Motion of the Official
    Committee of Unsecured Creditors Seeking to Expand the Scope of Powers of the Chapter 11
24  Examiner, Ex. A, at 5:4-8. The "Estate Causes of Action" were defined in the stipulation as the
    potential causes of action described in Aronzon's Examiner's Report "that might be pursued by
25  [Woodside Group] against certain former and current officers, directors and shareholders of
    [Woodside Group] (together with any other causes of action against such parties that might flow
26  from the facts described in the Trustee Motion or the Examiner's Report . . . )." Id. at 2:28-3:3.
27

1    On January 23, 2009, the Committee filed a motion seeking to substitute itself as plaintiff

2  in the adversary proceeding on the basis that as of October 2, 2008, the date on which the

3  Committee was formed, the Committee assumed responsibility for addressing all issues relating

4  to the Corporate Restructuring.  On January 30, 2009, the court granted the Committee's motion

5  and substituted the Committee for JPMorgan Chase as plaintiff in the adversary proceeding.  On

6  February 9, 2009, the court dismissed the adversary proceeding at the request of the parties.[20]

7  L.    The Committee's Complaint

8    On September 17, 2009, the Committee filed its complaint in this adversary proceeding

9  seeking relief against the Defendants, as shareholders of Woodside Group and PHI, for alleged

10  unjust enrichment; fraudulent transfers under Nev. Rev. Stat. §§ 112.140, et seq., Utah Ann.

11  Code § 25-6-6(2), and 11 U.S.C. §§ 548, 550, and 551; avoidable insider preferences under 11

12  U.S.C. §§ 547(b), 550, and 551; and unlawful distributions pursuant to Nev. Rev. Stat. §

13  78.288(2).  The Committee's complaint also seeks relief against Defendants, Nilson, Nelson and

14  Farnsworth[21] for alleged breach of fiduciary duty as officers and/or directors of Woodside Group

15  and PHI.  On September 24, 2009, the Committee filed its motion requesting issuance of a

16  preliminary injunction to preserve state and federal tax refunds exceeding $110 million either

17  received, or to be received, by the Defendants for tax years 2006 and 2007 pending a trial on the

18  merits of the Committee's claims.[22]  On October 2, 2009, the Nilson Defendants filed their

19

20  [20] The Stipulated Order Resolving and Dismissing Adversary Proceeding entered on February 9,
    2009, authorized Woodside Group "to prepare and file [its] tax returns for the calendar year 2008
21  based upon, and reflecting the Tax Reorganization . . . provided [Woodside Group] provide a
    copy of such returns to the Committee in advance of filing with the appropriate taxing
22  authorities."  The order further stated that "nothing in this Order shall be construed to restrain
    any individual named as a defendant . . . from filing any tax returns individually, as beneficiaries
23  of any trust, or for any person or entity other than the Entity Defendants."

24  [21] The complaint was dismissed as to Farnsworth with prejudice by stipulation filed on
25  December 31, 2009.

26  [22] The parties concede that the tax refunds at issue in this adversary proceeding could
    substantially exceed $110 million given the impact of the Worker, Homeownership, and
27

1  response in opposition to the motion, arguing that the requested injunction should not issue

2  because the Committee is unable to make a clear showing of either likely success on the merits or

3  likely irreparable harm absent the relief sought.  Seven days later, the Nilson Defendants filed

4  their answer to the Committee's complaint.  Crockett and Ure answered the Committee's

5  complaint on October 30, 2009.

6      After a brief period for discovery, the court commenced an evidentiary hearing on

7  November 23, 2009, to consider the merits of the Committee's motion.  At the hearing, the

8  Committee introduced testimony and evidence only concerning the merits of its unjust

9  enrichment theory to support its request for preliminary relief.  At the conclusion of the hearing

10  on November 25, 2009, the matter was taken under submission.

11                                    II. DISCUSSION

12      This court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157(b) and

13  1334(b).  This proceeding involves both core and non-core matters.  Venue is appropriate in this

14  court.  28 U.S.C. § 1409(a).

15  A.    Standard for Preliminary Injunction.

16      Rule 65(a)(1) permits the court to issue a preliminary injunction on notice to the adverse

17  party.[23]  F.R.Civ.P. 65(a)(1).  "A preliminary injunction is an extraordinary remedy never

18  awarded as of right."  Winter v. Natural Res. Def. Council, Inc., ___ U.S. ___, 129 S.Ct. 365,

19  376, 172 L.Ed.2d 249 (2008); see Munaf v. Geren, 553 U.S. ___, 128 S.Ct. 2207, 2218-2219,

20  _____

21  Business Assistance Act of 2009, Pub. L. No. 111-92, enacted on November 6, 2009, which
   provides, among other things, that a taxpayer with net operating losses ("NOLs") for 2008 or
22  2009 may elect to carry the NOL from one of those years back to the third, fourth, or fifth
   preceding taxable year instead of the second taxable year.  On November 20, 2009, the Internal
23  Revenue Service ("IRS") issued Revenue Procedure 2009-52 which outlines the procedure for
   making such an election.
24

25  [23] Rule 65(a)(1) is applicable to adversary proceedings by virtue of FRBP 7065, which states that
   "Rule 65 F.R.Civ.P. applies in adversary proceedings, except that a temporary restraining order
26  or preliminary injunction may be issued on application of a debtor, trustee, or debtor in
   possession without compliance with Rule 65(c)."  FRBP 7065.
27

1    171 L.Ed.2d 1 (2008) ("A preliminary injunction is an extraordinary and drastic remedy."). A

2    prohibitory injunction prevents parties from taking action and "preserve[s] the status quo pending

3    a determination of the action on the merits." Chalk v. U.S. Dist. Court, 840 F.2d 701, 704 (9th

4    Cir. 1988); see Heckler v. Lopez, 463 U.S. 1328, 1333 (1983) (stating that a prohibitory

5    injunction "freezes the positions of the parties until the court can hear the case on the merits").

6        To obtain a preliminary injunction, the moving party must "establish that he is likely to

7    succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

8    relief, that the balance of equities tips in his favor, and that an injunction is in the public

9    interest."[24] Winter, 129 S.Ct. at 374; see Sierra Forest Legacy v. Rey, 577 F.3d 1015, 1021 (9th

10   Cir. 2009). "In each case, courts 'must balance the competing claims of injury and must consider

11   the effect on each party of the granting or withholding of the requested relief.'" Winter, 129

12   S.Ct. at 376 (quoting Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987)).

13       Generally, a preliminary injunction may not issue simply to freeze unencumbered assets

14

15   [24] Prior to Winter, the Ninth Circuit recognized two differing standards for the issuance of a
     preliminary injunction. The traditional test required the plaintiff to establish "(1) a strong
16   likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if
     preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4)
17   advancement of the public interest (in certain cases)." Taylor v. Wesly, 488 F.3d 1197, 1200
     (9th Cir. 2007). The "alternative test" required that "plaintiff demonstrate either a combination
18   of a probable success on the merits and the possibility of irreparable injury or that serious
     questions are raised and the balance of hardships tips sharply in his favor." Id. "These two
19   formulations represent[ed] two points on a sliding scale in which the required degree of
     irreparable harm increase[d] as the probability of success decrease[d]. They [were] not separate
20   tests but rather outer reaches of a single continuum." Id. Some district courts in the Ninth
     Circuit have limited Winter's application, holding that the second prong of the alternative test
21   remains viable. See, e.g., Save Strawberry Canyon v. Dept. of Energy, 613 F.Supp.2d 1177,
     1180 n.2 (N.D. 2009) ("Winter does not foreclose injunctive relief in such situations."); Stross v.
22   Gables Condominium Ass'n, 2009 WL 1770129, *2 (W.D. Wash. 2009) (construing Winter as
     modifying only the traditional test). See also Brady Campaign To Prevent Gun Violence v.
23   Salazar, 612 F.Supp.2d 1, 12 (D.D.C. 2009) (stating that "the D.C. Circuit's sliding-scale
     standard remains viable even in light of the decision in Winter"). However, the Ninth Circuit has
24   clarified "[t]o the extent that our cases have suggested a lesser standard, they are no longer
     controlling, or even viable." Am. Trucking Ass'ns, Inc. v. City of L.A., 559 F.3d 1046, 1052
25   (9th Cir. 2009).

26

27

1   pending an adjudication of the plaintiff's cause of action against a defendant.  See  Grupo

2   Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 333 (1999) ("[W]e hold

3   that the district court had no authority to issue a preliminary injunction preventing petitioners

4   from disposing of their assets pending an adjudication of respondent's contract claim for money

5   damages.").  However, the Ninth Circuit has held that "where . . . a party in an adversary

6   bankruptcy proceeding alleges fraudulent conveyance or other equitable causes of action, Grupo

7   Mexicano does not bar the issuance of a preliminary injunction freezing assets."  Rubin v.

8   Pringle (In re Focus Media, Inc.), 387 F.3d 1077, 1085 (9th Cir. 2004), cert. denied, 544 U.S. 923

9   (2005).

10  B.      Choice of Law

11          Bankruptcy courts apply federal choice of law rules.  Liberty Tool & Mfg. v. Vortex

12  Fishing Sys., Inc. (In re Vortex Fishing Sys., Inc.), 277 F.3d 1057, 1069 (9th Cir. 2002); see

13  Lindsay v. Beneficial Reinsurance Co. (In re Lindsay), 59 F.3d 942, 948 (9th Cir. 1995) ("In

14  federal question cases with exclusive jurisdiction in federal court, such as bankruptcy, the court

15  should apply federal, not forum state, choice of law rules.").  "Federal choice of law rules follow

16  the approach of the Restatement (Second) of Conflict of Laws."  Vortex Fishing, 277 F.3d at

17  1069; see Chuidian v. Philippine Nat'l Bank, 976 F.2d 561, 564 (9th Cir. 1992).

18          Section 221 of the Restatement (Second) of Conflict of Laws ("Restatement"), which sets

19  out the rule when a court is faced with a choice of law regarding restitution, states:

20      (1) In actions for restitution, the rights and liabilities of the parties with respect to the
        particular issue are determined by the local law of the state which, with respect to that
21      issue, has the most significant relationship to the occurrence and the parties under the
        principles stated in § 6.

22
        (2) Contacts to be taken into account in applying the principles of § 6 to determine the
23      law applicable to an issue include:

24          (a) the place where a relationship between the parties was centered, provided that
            the receipt of enrichment was substantially related to the relationship,

25          (b) the place where the benefit or enrichment was received,

26          (c) the place where the act conferring the benefit or enrichment was done,

27
                                              - 25 -

(d)  the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(e)  the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment. These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement § 221.  Section 6(2) of the Restatement sets forth the following factors the court

must apply to determine which state has the "most significant relationship" to the parties and the

occurrence:

(a)  the needs of the interstate and international systems,

(b)  the relevant policies of the forum,

(c)  the relevant policies of other interested states and the relative interests of those states in the determination of a particular issue,

(d)  the protection of justified expectations,

(e)  the basic policies underlying the particular field of law,

(f)  certainty, predictability and uniformity of result, and

(g)  ease in the determination and application of the law to be applied.

Restatement § 6(2).

Applying the principles set forth in Restatement §§ 6(2) and 221, the court finds that

Nevada law governs this dispute.  Utah has an interest in regulating Woodside Group, as its

principal offices are in Utah.  However, the Restatement factors weigh in favor of Nevada.

Woodside Group and its affiliate, PHI, are incorporated under the laws of the state of Nevada.

Woodside Group does business in eight states, including Nevada, and maintains a regional office

in Las Vegas, Nevada.  Nilson, Woodside Group's Chief Executive Officer, and his spouse,

Leicha B. Nilson, reside in Nevada.  Nilson and his spouse are Woodside Group's controlling

shareholders, owning 90% of the outstanding stock of the corporation.  Nilson and his spouse are

also the controlling shareholders of PHI.  The dividends that gave rise to the tax refunds at issue

were declared by Woodside Group and paid through PHI pursuant to Nevada law.

Because Woodside Group's controlling shareholders reside in Nevada, the largest portion

of the dividends declared by Woodside Group in 2006, 2007, and 2008 were paid to residents of

Nevada.  Conversely, tax refunds attributable to taxes paid with such dividends have been, or

will be, received by Nevada residents.  Not only are Nevada's connections with the Committee's

claim "considerably more substantial, immediate, and concrete" than Utah's, but the interests of

Utah will not suffer by the application of Nevada law to the disputed issues pending before the

court.  See Aalmuhammed v. Lee, 202 F.3d 1227, 1237 (9th Cir. 1999) ("The question is which

state's interest would suffer more by the application of the other's law.").  Finally, the application

of Nevada law is consistent with the Restatement's guidance that local law be selected in a

manner that promotes "certainty, predictability and uniformity of result" and "ease in the

determination and application of the law to be applied."  Restatement § 6(2)(f) & (g).  Therefore,

Nevada law on unjust enrichment will be applied.

C.      Likelihood of Success on the Merits

         Pursuant to Winter, the Committee must demonstrate that it is "likely to succeed on the

merits." 129 S.Ct. 375-376; see Stormans Inc. v. Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009).

The Committee asserts seven distinct causes of action in its complaint, but has urged only one

claim in support of its request for a preliminary injunction – unjust enrichment.

         1. Unjust Enrichment

         Under Nevada law, "[u]njust enrichment occurs whenever a person has and retains a

benefit which in equity and good conscience belongs to another." Unionamerica Mortgage and

Equity Trust v. McDonald, 626 P.2d 1272, 1273 (Nev. 1981). "Unjust enrichment is the unjust

retention of a benefit to the loss of another, or the retention of money or property of another

against the fundamental principles of justice or equity and good conscience." Nev. Indus. Dev.,

Inc. v. Benedetti, 741 P.2d 802, 804 n.2 (Nev. 1987); see Coury v. Robison, 976 P.2d 518, 521

(Nev. 1999). In Nevada, "the terms 'restitution' and 'unjust enrichment' are the modern

counterparts of the doctrine of quasi-contract." Unionamerica Mortgage, 626 P.2d at 1273.

When a defendant has been unjustly enriched by the receipt of benefits in a manner not governed

1    by contract, a contract is implied under Nevada law once the plaintiff establishes three essential

2    elements: "'[A] benefit conferred on the defendant by the plaintiff, appreciation by the defendant

3    of such benefit, and acceptance and retention of such benefit under circumstances such that it

4    would be inequitable for him to retain the benefit without payment of the value thereof.'"

5    Leasepartners Corp. v. Robert L. Brooks Trust, 942 P.2d 182, 187 (Nev. 1997) (quoting

6    Unionamerica Mortgage, 626 P.2d at 1273). Unjust enrichment generally is unavailable when a

7    valid, express contract exists that governs the subject matter of the dispute. Id.

8        2. Defendants' Contentions

9        Defendants assert that the Committee has no likelihood of success on the merits of its

10    unjust enrichment claim for three reasons. First, Woodside Group's payment of the dividends

11    was authorized under Nevada law which provides, in pertinent part:

12        1. Except as otherwise provided in subsection 2 and the articles of incorporation, a board
          of directors may authorize and the corporation may make distributions to its stockholders,
13        including distributions on shares that are partially paid.

14        2. No distribution may be made if, after giving it effect:

15            (a) The corporation would not be able to pay its debts as they become due in the
              usual course of business; or

16
            (b) Except as otherwise specifically allowed by the articles of incorporation, the
17            corporation's total assets would be less than the sum of its total liabilities plus the
              amount that would be needed, if the corporation were to be dissolved at the time
18            of distribution, to satisfy the preferential rights upon dissolution of stockholders
              whose preferential rights are superior to those receiving the distribution.

19
        3. The board of directors may base a determination that a distribution is not prohibited
20        pursuant to subsection 2 on:

21            (a) Financial statements prepared on the basis of accounting practices reasonable
              under the circumstances;

22
            (b) A fair valuation, including, but not limited to, unrealized appreciation and
23            depreciation; or

24            (c) Any other method that is reasonable in the circumstances.

25    Nev. Rev. Stat. § 78.228. Defendants argue that, in authorizing the dividends, Woodside

26    Group's senior management relied on KPMG audited financial statements for 2006 and 2007,

27

- 28 -

1  which showed a solvent company. The Committee's attack that the shareholders' received

2  dividends of nearly 44% of the company's profits ignores not only the fact that Woodside

3  Group's shareholders left 56% of the net profits in the company, but that § 5.5.3 of the Credit

4  Agreement itself permits up to 75% of profits to be distributed to shareholders.[25]

5       Secondly, the Committee is unable to establish a direct benefit conferred by either the

6  Committee or Woodside Group on the Defendants. The Committee seeks to recover tax refunds

7  that were paid to the Defendants by the IRS and state taxing authorities. Defendants point out

8  that the tax refunds are not a return of dividends paid by Woodside Group, but of taxes paid by

9  the Defendants.[26] Woodside Group, as a subchapter S corporation, was a pass-through entity for

10  income tax purposes. Because Defendants, as shareholders, paid taxes on the income of

11  Woodside Group, Defendants had the corresponding right, as shareholders, to carry back any tax

12  losses and claim any tax refunds triggered by such losses. Defendants reason that the only choice

13  facing senior management in July 2008 was to get the money or leave it with the IRS. Senior

14  management, according to Defendants, would arguably have breached a fiduciary duty to

15  Woodside Group's shareholders had it failed to structure a reorganization that maximized tax

16  benefits to its shareholders.

17

18  _____

[25] Section 5.3.3 of the Credit Agreement states:

19      <u>Minimum Borrowing Group Net Worth</u>. Combined Tangible Net Worth of the members
    of the Borrowing Group shall not be less than the sum of: (a) $548,000,000, plus (b)

20      twenty-five percent (25%) of the net income of the members of the Borrowing Group
    earned for each fiscal quarter after December 31, 2005 (excluding any quarter in which

21      there is a net loss), plus (c) ninety percent (90%) of the net proceeds for any equity issued
    by the members of the Borrowing Group after the Effective Date.

22

23  Ex. 1, at 57.

24  [26] "IRC § 6402(a) authorizes the Secretary of the Treasury to pay a refund to a person who made
an overpayment of taxes. In this case, the Defendants are the parties who overpaid the taxes that

25  were subsequently refunded. Neither Woodside nor Plaintiff paid any portion of those taxes and,
consequently, had no entitlement to the refunds that were paid." Defendants' Response to

26  Plaintiff's "Trial Brief" Submitted in Opposition to Motion for Preliminary Injunction, at 5:n.6.

27

-  29 -

1    Finally, Defendants argue that the facts of this proceeding are nearly identical to those

2  confronting the bankruptcy court in Official Comm. of Unsecured Creditors v. Forman (In re

3  Forman Enterprises, Inc.), 281 B.R. 600 (Bankr. W.D. Pa. 2002), and therefore, the decision in

4  Forman Enterprises should be dispositive.

5    3.  The Forman Enterprises Case

6    In Forman Enterprises, Sam Forman, Larry Ashinoff, Brett Forman, Wendy Forman, and

7  Richard Forman (collectively, the "Formans") each owned shares of Forman Enterprises, Inc.

8  ("Forman Enterprises"), a subchapter S corporation.  Each held their shares in Forman

9  Enterprises, subject to a shareholders' agreement dated February 19, 1996, which provided, in

10  pertinent part, in § 9.01:

11    . . . . Commencing with tax-year 1996 and for each year thereafter for which the [debtor]
    is an S corporation for federal income tax purposes, the [debtor] shall pay a dividend to
12    each of the stockholders to allow such stockholder to pay the federal and state income tax
    or tax estimates payable by such stockholders attributable to such stockholders' allocable
13    share of the [debtor's] income computed for such year.

14  Id. at 604.  Each received dividends in 1997, 1998, and 1999 pursuant to § 9.01 of the

15  shareholder agreement to pay income taxes owed on their respective share of Forman

16  Enterprises's actual or estimated taxable income for 1997, 1998, and 1999.  After the payment of

17  dividends in 1999, Forman Enterprises estimated that it would actually sustain a loss for 1999 of

18  up to $1,500,000.  Four of the five shareholders, at the request of Forman Enterprises, each

19  executed a promissory note evidencing repayment of the 1999 dividends received not later than

20  December 31, 1999.  Forman Enterprises carried as an account receivable the dividends paid in

21  1999 to the remaining shareholder, who refused to sign a note to the corporation.  The notes and

22  account receivable were assigned to PNC Bank.  Forman Enterprises filed its federal income tax

23  return for 1999 reporting a NOL of $16,695,074.  The Formans filed their personal income tax

24  returns for 1999, carried back the corporation's NOL to tax years 1997 and 1998, and collectively

25  sought tax refunds for those years in excess of $5,289,000.

26    On January 26, 2000, Forman Enterprises filed a voluntary chapter 11 petition.

27

- 30 -

1    Approximately two years later, the creditors' committee filed an adversary proceeding against the

2    Formans alleging claims for unjust enrichment, breach of fiduciary duty, and unauthorized post-

3    petition transfer under § 549, and seeking to recover the tax benefits and refunds received by the

4    Formans attributable to the corporation's 1999 NOL.  On June 6, 2001, the Forman Enterprises

5    case was converted to a liquidation under chapter 7.  The chapter 7 trustee, who succeeded the

6    creditors' committee as plaintiff in the adversary proceeding, did not dispute that the Formans

7    had "complied with the requirements of the Internal Revenue Code in carrying back the NOL to

8    prior taxable years to obtain refunds of income taxes paid for those years" and conceded that the

9    Formans were "entitled to refunds under the Internal Revenue Code." Id. at 606.  After a trial on

10   the merits, the bankruptcy court rejected the chapter 7 trustee's unjust enrichment claim based on

11   the facts of the case, holding that it would not be inequitable or unjustifiable for [the Formans] to

12   retain for themselves the tax refunds arising out of their utilization of the 1999 NOL suffered by

13   the debtor." Id. at 608.  In so holding, the court stated:

14           The chapter 7 trustee's theory of the case, especially the cause of action for unjust
        enrichment, is predicated on the proposition that the debtor, not defendants, paid
15      defendant's income taxes while defendants retained the tax refunds.  Were this
        characterization accurate, we might be inclined to agree with the trustee that it would be
16      inequitable or unjustifiable, and that defendants would be unjustly enriched, if they were
        to retain the tax refunds for themselves when debtor had paid the income taxes they
17      owed.

18           Looking at the issue from a different perspective, it is clear that if the shareholders
        had a tax liability for the tax years 1995, 1996, 1997, and 1998, that the corporation
19      earned a profit during that period.  Rather than taking all of the profit and utilizing a
        portion of same to pay the tax, the shareholders merely took a sum sufficient to pay the
20      tax and left the balance in the corporation as a capital infusion.  Greedy insiders having
        no concern for creditors might not have elected this option.  These shareholders did so
21      elect.

22           We reject the chapter 7 trustee's "spin" concerning who paid defendants' income
        taxes in the first place.  As we see it, defendants, not debtor, paid the income taxes
23      defendants owed as shareholders of an S corporation.

24           In accordance with § 9.01 of the shareholders' agreement, debtor merely paid a
        dividend from its income to each shareholder so the shareholder could pay income tax he
25      or she owned that was attributable to the shareholder's allocable share of debtor's
        income.  When viewed in this light, without something more it would not be inequitable
26      or unjustifiable for defendants to retain for themselves a refund of income taxes they
        themselves paid from dividends from income they had received as shareholders of an S

27

                                        - 31 -

1    corporation.

2    The trustee offered no evidence showing that this arrangement between the debtor
and defendants was "done on the sly" or that it was an artifice devised by defendants to
3    benefit themselves and to deprive debtor's creditors should debtor become insolvent. It
instead was done so defendants could lawfully avail themselves of the tax benefits
4    provided by the Internal Revenue Code concerning S corporations.

5    Id. at 609 (emphasis added).

6    4. The Committee Has Established a Likelihood of Success on the Merits

7    First, the Committee has established that a benefit was conferred by Woodside Group on

8    the Defendants. Woodside Group's stated policy was that it was "under no obligation to issue

9    dividends or distributions" and that it expected to "retain most or all of its income for additional

10    investment opportunities."[27] Yet Woodside Group distributed $234 million in dividends to its

11    shareholders in 2006 and 2007. Shareholders expected to receive regular dividends from

12    Woodside Group sufficient to pay any income tax obligation associated with their ownership

13    interest in the corporation.[28] Nilson had represented to shareholders that they could expect such

14    dividends,[29] notwithstanding Woodside Group's stated policy that such dividends were

15

16

17    [27] See footnote 12 supra.

18    [28] "When we became a sub-S corporation long ago, we undertook an obligation in
19    communication with all of the people who became shareholders to dividend out a sufficient
amount so that they could pay their taxes as they came due. Given that we had made a lot of
20    money, we paid out enough dividends so that all the shareholders could pay their taxes. Had we
not done that, we would have been sued by everybody, I'm sure, who had stock who couldn't pay
21    their tax obligation." Ex. 200, at 294:23-295:6.

22    [29]    Q.    Let me make sure I understand. Whenever the company sold stock to new
23              shareholders, there was always a representation by you as the chairman of the
              board that the company was going to pay out dividends sufficient to meet
24              individual tax obligations as they came due?

25        A.    As they were associated with that income.

26    Id. at 296:8-14.

27
- 32 -

1   discretionary and the company was under no obligation to make them.[30]

2       Woodside Group calculated its dividend distributions to make certain that all taxes

3   attributable to each shareholder's respective ownership interest in the corporation was paid.

4   Senior management's formula for calculating dividends was clear. Based on projections of

5   taxable income, senior management would periodically declare dividends using a rate of 44.3%,

6   which assumed a federal income tax rate of 35% and California's income tax rate of 9.3%.

7   Senior management timed each dividend distribution to coincide with estimated tax payments

8   due by Woodside Group's shareholders to state and federal taxing authorities.[31]  Once the final

9   return was completed, a dividend would be declared in April "to make up for any

10   shortcomings."[32]  Arave, who set the amount of each dividend, testified that Woodside Group

11   had a moral obligation to issue dividends for such purpose.[33]  Woodside Group's treasurer, Chad

12   Gardner, testified essentially that dividends would be paid if the company showed taxable

13   income, notwithstanding the impact of the distribution on the company's ability to fund its

14   operations.[34]  In the words of the Committee's counsel, Woodside Group's senior management

15   was, in essence, "running a concierge service" for the payment of taxes.

16       Second, the Committee has established that the Defendants understood and appreciated

17   the benefit conferred by Woodside Group. Given Nilson's representations regarding Woodside

18   Group's dividend practice, shareholders receiving dividends knew they were being paid to enable

19   them to pay their income tax liabilities as shareholders of the corporation. Nilson testified that

20   "[w]ithout the dividend payments paid to Woodside's shareholders, most of them would have

21   _____

22   [30] See footnote 12 supra.

23   [31] Ex. 121.

24   [32] Ex. 193, at 45:23-46:4.

25   [33] Ex. 194, at 257:22-258:8.

26   [34] Ex. 197, at 316:6-317:25.

27

1    had no way to pay the potential taxes attributable to their respective portion of Woodside's

2    taxable income."[35]  Nelson agreed, testifying that "[w]ithout the dividend payments paid to me

3    over the years, I, like most of Woodside's shareholders, would have had no way to pay the

4    potential taxes attributable to my portion of Woodside's taxable income."[36]  Cosgrave testified

5    that there was never a time when Woodside Group did not make a dividend distribution in an

6    amount sufficient to pay taxes related to her interest in the corporation.[37]  Nilson, Arave, Nelson,

7    Haywood, Pugsley, and Cosgrave testified that they have received, or expect to receive, refunds

8    of federal and state taxes paid with such dividends in 2006 and 2007 in the aggregate amount of

9    $85,351,960 due to the loss triggered by the Corporate Restructuring on or about July 25, 2008.

10   Rightly or wrongly, Woodside Group's financial reporting manager, Scott Allen, understood the

11   refunds to be "essentially the return of money that were paid out of the company to make those

12   tax payments."[38]

13

---

14   [35] Nilson Decl. at 11:21-22, Nov. 16, 2009.

15   [36] Nelson Decl. at 4:14-16, Nov. 16, 2009.

16   [37] Ex. 196, at 14:5-9

17

18   [38]      Q.     And is it your understanding that the refunds that are recoverable and have been
                     recovered by these individuals and by these trusts are essentially the return of
19                    money that were paid out of the company to make those tax payments?

20              MR. CASTANARES: Objection. Assumes facts not in evidence, is
                argumentative, and calls for speculation.
21

22         A.     I would guess so, yes.

23         Q.     Well, I mean –

24         A.     I mean, based on what's out there. I don't know what their personal tax situations
                  are, so I – you know, I can't testify as to each and every one. But I would have to
25                guess due to the nature of the size that the bulk of it, yes, would be.

26   Ex. 193, at 141:8-22.
27
                                        - 34 -

1    Because there is no evidence of a written contract, the Committee's unjust enrichment

2  theory hinges on whether retention of the benefit would be inequitable.  In this regard, the

3  Forman Enterprises case is clearly distinguishable.  There is nothing in Forman Enterprises to

4  indicate that the corporation failed either to review its debt instruments to determine if dividends

5  were permissible or to perform a meaningful analysis of its net profits, cash flow, and the actual

6  tax exposure of its shareholders before declaring a dividend to assist shareholders in paying taxes

7  on income attributable to their interests in the corporation.  Secondly and more to the point, there

8  was no evidence in Forman Enterprises showing that the action taken by the debtor's

9  management and its shareholders "was 'done on the sly' or that it was an artifice devised by

10  defendants to benefit themselves and to deprive debtor's creditors should debtor become

11  insolvent." Forman Enterprises, 281 B.R. at 609.

12    In this case, senior management invoked the jurisdiction of this court over two of

13  Woodside Group's Restricted Subsidiaries, AMR 107 and Portofino, after Woodside Group's

14  admitted default under the Credit Agreement and Noteholder Debt and during protracted

15  negotiations with it largest creditors, the Bank Group and Noteholder Group, concerning a global

16  restructuring of its debt to the parties.  While those negotiations were ongoing and the AMR 107

17  and Portofino bankruptcy cases were pending, senior management, which held over 90% of

18  Woodside Group's outstanding stock, hatched a scheme in May 2008, with the able assistance of

19  Ernst & Young and Parr Waddoups, to strip the tax basis of Woodside Group's assets, trigger a

20  $500 million tax loss, and generate $110 million in tax refunds solely for the benefit of the

21  shareholders.  Senior management used Woodside Group's funds to devise and implement the

22  scheme that triggered the tax refunds.  Senior management sought to consummate the scheme

23  while intentionally keeping it a secret from Woodside Group's largest creditors, the court in

24  AMR 107 and Portofino, and its own restructuring professionals, A&M and Pachulski, Stang.

25  They did so to give them leverage in the ongoing negotiations with the Bank Group and

26  Noteholder Group, and to place the tax refunds out of the creditors' reach.  Senior management

27

- 35 -

1   intentionally kept the Bank Group, Noteholder Group, and the court in the dark as they bought

2   time to consummate the reorganization while ostensibly negotiating in good faith to restructure

3   Woodside Group's indebtedness. Senior management engineered the tax recognition for their

4   personal benefit, electing to risk the future of Woodside Group and its 494 employees who were

5   depending on a successful financial restructuring of the company. Facts such as these also do not

6   exist in the Forman Enterprises case.

7        Nilson, Nelson, and Arave each testified that, in making the decision to declare a

8   dividend, they "always considered Woodside's overall financial situation" and relied "on the

9   audited financial statements and our own knowledge of the company's performance."[39] Nilson

10  and Arave added that Woodside employed qualified employees "to analyze and make

11  recommendations on dividend declarations."[40] However, there is little evidence to suggest that

12  Woodside Group performed a meaningful review of whether a dividend distributed by the

13  company was permissible under its debt instruments, represented an actual return on investment,

14  or would stress the cash flow of the company. Woodside Group stipulated that it was in default

15  under the Credit Agreement on October 24, 2007, but the events of default occurred as early as

16  December 2006. It is undisputed that the existing defaults under the Credit Agreement created

17  corresponding defaults under Woodside Group's obligations to the Noteholder Group. Whether

18  or not § 5.5.3 of the Credit Agreement authorized up to 75% of profits to be distributed to

19  shareholders, the payment of dividends to the Subordinated Lenders was permitted only if no

20  default existed under the Credit Agreement.

21       Arave testified that dividend distributions by Woodside Group were not considered at a

22  formal meetings of the board of directors nor did he prepare an analysis for presentation to the

23

24  _____

25  [39] Nilson Decl. at 7:5-7, Nov. 16, 2009; Nelson Decl. at 6:12-14, Nov. 16, 2009; Arave Decl. at
    6:14-16, Nov. 16, 2009.

26
    [40] Nilson Decl. at 7:7-8, Nov. 16, 2009; Arave Decl. at 6:16-17, Nov. 16, 2009.
27

1   board in conjunction with a proposed distribution.[41] Arave further testified that he had no formal

2   training regarding the preparation of a distribution analysis for a company.[42] Although the

3   corporation maintained minutes of meetings at which Woodside Group's directors ostensibly met

4   to consider the merits of a dividend, Arave testified that dividends were declared on a

5   "nonformal basis."[43] To the extent the distribution exceeded the amount actually needed to pay

6   federal and state income taxes attributable to their ownership interest in Woodside Group,

7   shareholders who resided in states with either lower tax rates or no state taxes, such as Nilson

8   and Arave, simply pocketed the difference. Woodside Group's practice to distribute to

9   shareholders 44.3% of its net profits as dividends to enable shareholders pay taxes attributable to

10

11   [41] Ex. 194, at 235:14-236:12.

12   [42] Id. at 237:14-19.

13   [43]

14

| | | |
|---|---|---|
| | Q. | Well, there wasn't a board of director meeting called for the purpose of determining whether to declare dividends – |
| | A. | Not – |
| | Q. | – ever. Right? |
| | A. | Not that I can recall. |
| | Q. | Okay. They were instead done on a nonformal basis – |
| | A. | Yes. |
| | Q. | – those decisions? And there were not contemporaneous meeting minutes prepared in connection with those informal meetings? |
| | A. | I usually didn't prepare those minutes so I can't say. |
| | Q. | Well, who did? |
| | A. | Wayne Farnsworth prepared the minutes. |
| | Q. | Was he – did he even attend these informal meetings? |
| | A. | Sometimes. |
| | Q. | At times when he didn't, who prepared the minutes. |
| | A. | Wayne did. |
| | Q. | You just told him what was decided? |
| | A. | Yes. |
| | Q. | Okay. The board of director – how long after these meetings took place were board of director meeting minutes prepared? |
| | A. | I don't know. |

Id. at 58:11-59:13.

- 37 -

1    their respective interests in the corporation continued through May 9, 2008, notwithstanding the

2    resulting cash stress on the corporation.

3        Even assuming the dividends by Woodside Group in 2006 and 2007 were entirely

4    legitimate at the time of distribution, the shareholders had no expectation of getting any of the

5    money back after the payment of taxes.[44]  It was the Corporate Restructuring plan, undertaken by

6    senior management on the stated belief that a write down of the value of Woodside Group's

7    assets would not adversely affect the economic or pecuniary interests of Woodside Group's

8    creditors, that triggered the return of a substantial portion of those funds.[45]

9        If senior management truly believed that the Corporate Restructuring plan concocted in

10   May 2008 was a proper exercise of their fiduciary responsibilities and in the best interests of

11

12   [44] Woodside Group's largest shareholder certainly had no such expectation.  In his deposition on

13   October 19, 2009, Nilson testified:

14       Q.    Let me just ask it this way.  Prior to January 2008 you had no expectation that you
             were going to receive the vast sums of money through tax refunds that you have
15           now received in connection with any sort of conversion.

16       A.    No.
         Q.    Is that correct?
17       A     That's correct.

18   Ex. 199, at 93:3-10.

19   [45] "I understood there was no harm to creditors from the Corporate Restructuring.  I understood

20   that under Generally Accepted Accounting Principles the restructuring of Woodside Group, Inc.
     would be treated as a conversion.  I also understood that the tax effect of the Corporate
21   Restructuring is that Woodside Group, Inc. as a corporation will be deemed to have sold its

22   assets, and then re-contributed the assets to the newly converted Woodside Group, a limited
     liability company.  The "E&Y Presentation" stated, and I understood, that "[t]he basis of the
23   assets contributed to the partnership could not be lower than the greater of FMV of the assets or

24   the debt."  As of June 30, 2008, the fair market value of Woodside Group's assets was estimated
     to be approximately $1.3 billion, and the outstanding debt of [Woodside Group] was estimated to
25   be $1.28 billion, a number that includes approximately $330 million of intercompany debt owed

26   to PHI.  Because the tax basis of the assets cannot be written down below the amount of debt, I
     concluded and believe that the transaction could not have an adverse impact on creditors."  Ex.
     159, at 6:4-15.

27

1  Woodside Group, why do it on the sly?[46]  Why not disclose facts concerning the restructuring of

2  Woodside Group and its related entities to the Bank Group, the Noteholder Group, or even

3  Woodside Group's own restructuring professionals – A&M and Pachulski, Stang.[47]  Why conceal

4  facts concerning the restructuring of AMR 107 and Portofino from the court after filing voluntary

5  petitions with this court seven months earlier for the stated purpose of reorganizing those entities

6  under chapter 11.  Why not undertake the Corporate Restructuring in the light of day rather than

7  by stealth under a veil of secrecy?  The fact is, Woodside Group had defaulted on its obligations

8  to the two creditor groups that held the strings to its survival – the Bank Group and Noteholder

9  Group.  Despite nearly nine months of negotiations since execution of the initial Forbearance

10  Agreement, Woodside Group had yet to resolve existing and ongoing events of default.

11  Notwithstanding the negative impact on cash flow, senior management elected to use the

12  company's precious cash to fund dividends to its shareholders through May 2008 and to pay

13  _____

14  [46] Nilson testified that Woodside Group had been considering a restructuring for approximately
two or three years. Ex. 199, at 88:23-89:20. Arave testified that:

15      Based on ongoing discussions with potential sources of investment capital, [Woodside

16      Group] had been aware since January 2008 that the companies would be required to
        convert from subchapter S corporations and qualified subchapter S corporations to more

17      flexible entity structures in order to accommodate any form of outside investment and to
        avoid adverse tax consequences. In addition, the Noteholder Group's own proposal

18      would have required the conversion to happen in order for the company to retain its pass-
        through status. Thus, management understood that conversion of S corporations to

19      limited liability companies or limited partnerships would be economically advantageous
        for investors and creditors. Ernst & Young ("E&Y"), the company's tax advisors, also

20      had been advising the company for several years to consider converting to a limited
        liability company to deal with shareholder estate issues as well as to provide ease of

21      administration. Historically, however, this was inadvisable due to phantom income

22      issues.

23  Ex. 159, at 5:7-17.

24  [47] Particularly given the fact that Arave admits "[t]he tax incentives for the Corporate

25  Restructuring were substantial, and were well known to the Noteholder Group and Bank Group."
Ex. 159, at 4:10-11. And the fact that Nilson, Nelson, and Arave discussed using the tax refunds

26  in the context of a bankruptcy proceeding. Ex. 192, at 66:6-69:20.

27

1   undisclosed professionals to engineer a restructuring designed to place tax refunds directly

2   attributable to such dividends out of the reach of creditors.  For these reasons, retention of the

3   benefit in this case would be inequitable.

4   B.     Likelihood of Irreparable Harm Absent Preliminary Relief

5         "Preliminary injunctive relief is available only if plaintiffs 'demonstrate that irreparable

6   injury is <u>likely</u> in the absence of an injunction.'" <u>Johnson v. Couturier</u>, 572 F.3d 1067, 1081 (9th

7   Cir. 2009) (quoting <u>Winter</u>, 129 S.Ct. at 375).  Arave admitted as early as October 2008 that "the

8   tax refunds to be generated as a result of the Corporate Restructuring may be the principal source

9   of <u>any</u> recoveries from the shareholders."[48]

10        By declarations filed on October 2, 2009, Nilson, Arave, Pugsley, Haywood, and

11   Cosgrave each testified that the state and federal tax refunds received, or to be received,

12   attributable to Woodside Group's 2006 and 2007 NOLs generated by the Corporate Restructuring

13   have been, or will be, deposited into an interest-bearing account, commingled with other funds,

14   and invested conservatively.[49]  Each further testified that they intend to make "only ordinary

15   course expenditures of those funds," and that they will "not abscond with [the] funds, secrete

16   them, or take any other action designed to put them beyond the reach of creditors."[50]  However,

17   Defendants, individually and collectively, will not agree to an order prohibiting the use or

18   disposition of the funds in the account attributable to the tax refunds pending further order of the

19   court. The Committee fears that, absent a preliminary injunction sequestering a substantial

20

21   [48] Ex. 159, at 7:1-2 (emphasis added).

22   [49] Ex. 38, at 35:11-15; Ex. 39, at 30:22-25; Ex. 41, at 40:21-24; Ex. 40, at 37:21-24; Ex. 42, at
    43:21-23.

23

24   [50] Ex. 38, at 35:15-19; Ex. 39, at 30:25-28; Ex. 41, at 40:24-26; Ex. 40, at 37:24-26; Ex. 42, at
    43:24-25.  Nelson also testified that he had deposited the funds "into either one of our checking

25   accounts or brokerage accounts," that the "funds are commingled with other funds of ours in the
    same account, and are invested conservatively," and that he has "no intention of absconding with

26   those funds, secreting them, or taking any other action designed to put them beyond the reach of
    creditors."  Nelson Decl. at 9:5-11, Nov. 16, 2009.

27

1   portion of the tax refunds, the money will be converted from liquid accounts to illiquid

2   investments in other companies or property during the pendency of the lawsuit effectively

3   placing the funds out of the immediate reach of the estate.  The unwinding of these illiquid

4   investments, reasons the Committee, creates irreparable harm.

5        Defendants assert that the Committee failed to produce any credible evidence of genuine

6   irreparable harm or that it is likely to occur absent the issuance of a preliminary injunction, as

7   required by Winter.  Defendants attack the Committee's argument as circular, i.e., the fact that

8   the Defendants will not stipulate to the relief sought by the Committee in seeking a preliminary

9   injunction does not, in and of itself, establish either irreparable harm or that it is likely.

10  Defendants also accuse the Committee of attempting to balance the equities before establishing a

11  genuine threat of irreparable harm.  The fact is, according to Defendants, the tax refunds are all

12  the Defendants have left of their investments in Woodside Group with which to begin a fresh

13  start and they have no reason to squander the money during the pendency of the litigation.

14       Based on the evidence presented, the court believes that the Committee's fears are well-

15  founded.  At the hearing, Nilson and Arave testified that they have no current plans to invest in a

16  new business venture.  But Nilson and Arave were, in fact, exploring new investment

17  opportunities at the time they filed their declarations with the court on October 2, 2009.  Less

18  than 15 days later, Arave testified at his deposition that Nilson, Arave, Pugsley, Ure, and

19  Crockett were in discussions with Leucadia International to purchase assets from Zions which

20  conceivably would have required a cash investment of up to $50 million.[51]

21  _____

22  [51]   MR. CASTANARES: After consultation between Mr. Nilson and myself at which Mr.
        Arave was not present, it is our position that the confidentiality agreement does not
23      prohibit Mr. Arave from answering the pending question and he will do so.

24      A.    Leucadia International has interested – has expressed an interest in teaming up and
              purchasing some of the assets that Zions Bank has.
25      Q.    Teaming up with whom?
26      A.    Some of the existing management with Woodside that's being – were expected to
              be let go shortly after the bankruptcy.
27

-41-

1  _____

2    Q.    Who within the management team are you speaking of?
3    A.    Myself, Ezra Nilson, Seth Ure, David Crockett, Nate Pugsley.
     Q.    Anyone else?
4    A.    None that I know of.
     Q.    And when did these discussions with Leucadia begin?
5    A.    I got involved probably a month ago.
     Q.    Has Zions Bank indicated how much these assets are going to cost –
6    A.    No.
7    Q.    – to purchase?
     A.    No.
8
9  Ex. 194, at 331:7-332:7

10   Q.    Have you done any analysis as to the value of that land?
     A.    I think so.
11   Q.    And where are those documents?
     A.    They're at my home.
12   Q.    And who did the valuation of that land?
13   A.    I think Ezra and Nate Pugsley.

14 Id. at 332:22-333:3.

15   Q.    How much time have you and Mr. Nilson and the rest of this management team
           spent assessing these issues?
16   A.    Not much.
17   Q.    Well, enough to develop some draft of a business plan and to project out costs or
           the value of certain properties.  True?
18   A.    Yeah, on a pretty high level.
19   Q.    How many meetings has this team had in connection with this potential
           opportunity?
20   A.    I think I met with Nate twice and Ezra once.

21 Id. at 334:23-335:8.

22   Q.    What sort of investment do you think it will take to purchase these – this
           property?
23   A.    Oh, you know, if you bought the entire pool of assets at Zions, if you decided to
24         go for that play, it would be – the land would – you could maybe get it from Zions
           for 50 million.  Then you would have to develop it and build houses and so . . .
25   Q.    What portion of that investment would be finance versus equity in that deal?
26   A.    There's not much financing out there right now.
     Q.    So you would just put up whatever cash you had to develop that property?
27

- 42 -

1   The following day, Nilson confirmed the discussions with Leucadia International during his

2   deposition, testifying that he had also been in discussions with Och-Ziff, W.L. Ross, and Oaktree

3   about entering the home building business after confirmation.[52]  Having weighed the evidence

4   and assessed the credibility of the witnesses, the court finds there is a likelihood of irreparable

5   harm in the absence of a preliminary injunction against Nilson, Arave, Pugsley, Crockett, and

6   Ure.  While there is a distinct possibility that Nelson, Haywood, Cosgrave, and the remaining

7   Defendants might spend the tax refunds sought to be sequestered or invest in illiquid assets

8   pending a trial on the merits, the Committee has failed to demonstrate as to such Defendants that

9   irreparable harm is likely absent a preliminary injunction.

10  C.    The Balance of Hardships

11        A preliminary injunction can be narrowly tailored to target and prohibit a specific act

12  _____

13  A.    You're going to have to figure out some way because banks aren't in the business
          anymore.
14  Q.    And you have not approached any private equity group in that regard?
15  A.    No.
    Q.    Or any other source of capital in that regard?
16  A.    No.
    Q.    What is your timeline for trying to implement this potential opportunity?
17  A.    Well, I think it could happen fairly quickly.  I think Zions would like to get rid of
          the assets.  I think we would like – I mean, we obviously need to finish up with
18        our responsibilities with Woodside.  And, you know, once we finish up those
19        responsibilities for Woodside, we'd like to get started fairly quickly, either with
          that or something else.
20  Q.    When you say "fairly quickly," how soon do you think you'd be able to purchase
          these assets?
21  A.    Boy, dealing with Zions I don't know.  But you would – you would think where
22        we already know the assets and don't have to do a lot of due diligence that would
          be an advantage to us and we could probably get going within 30 to 45 days, you
23        would hope, but it could take longer.
    Q.    Have you disclosed any of these efforts to the bankruptcy court in California?
24  A.    No.

25  Id. at 336:10-338:1.

26  [52] Ex. 199, at 31:25-32:11.

27
                                    - 43 -

1  pending the outcome of the litigation. See, e.g., High Sierra Hikers Ass'n v. Blackwell, 390 F.3d

2  630, 641 (9th Cir. 2004) (recognizing the court's broad latitude in crafting equitable relief); U.S.

3  v. Odessa Union Warehouse Co-op, 833 F.2d 172, 175 (9th Cir. 1987) ("The essence of equity

4  jurisdiction is the power of the court to fashion a remedy depending upon the necessities of the

5  particular case."). In determining whether to grant such an injunction, the court "must assess the

6  harms pertaining to injunctive relief in the context of that narrow injunction." Sierra Forest

7  Legacy, 577 F.3d at 1022.

8       The Committee believes that an order impounding funds attributable to the tax refunds is

9  necessary to preserve the status quo pending a trial on the merits. The Defendants argue that

10 such an order would dramatically change the status quo.[53] The Committee seeks to impound tax

11 _____

12 [53] In closing argument on behalf of the Nilson Defendants, Mr. Castanares attacked the relief
   sought by the Committee as transforming, rather than preserving, the status quo, stating:

13

14      What all of this is about isn't what its going to come down to when the court enters
        judgment for one party or another. Because I don't believe and I have never believed that
15      the Plaintiff has any real case on the merits, even on this new theory. And I think the
        abandonment of all the theories they started on speaks volumes. I don't think this case is
16      about what is finally going to happen.

17      I think this case is about what we're here about today – it's about whether the money is
        going to get frozen. Because I think that everybody in this courtroom knows what a
18      dramatic change in the status quo that will be. This case is about freezing the money.

19
        And the dramatic change in the status quo is what I want to talk about. Plaintiff will get
20      to take something away from the Defendants that they have now. . . .

21      If this money is impounded and [Nilson] wants to use any part of it, he must come to
22      court and seek leave of the very people who have launched this litigation against him.
        And all this other litigation. And what can he reasonably expect that that will amount to?
23      He expects that he will have to litigate anything he proposes, and he expects this situation
        to go on for a long time probably measured in years. And he expects that to occur in a
24      context where there are no clear standards for what he will be allowed or refused.
        Everything he wants will be yet another piece of litigation. And everybody in this
25      courtroom knows he is exactly right.

26
        And he observes that these creditors were told a year ago by the examiner they would
27

-44-

refunds generated by a Corporate Restructuring that was devised by senior management, undertaken in secret, timed to provide leverage in ongoing negotiations with the Bank Group and Noteholder Group, and calculated to place the tax refunds out of the creditors' reach. The Committee has alleged causes of action on behalf of the estate based upon or arising out of senior management's Corporate Restructuring plan, including a claim of unjust enrichment. There is a direct link between the Committee's claim and the tax refunds sought to be frozen. Under these facts, an order freezing the funds is permissible and necessary to maintain the status quo. See Focus Media, 387 F.3d at 1085.

The tax refunds would be deposited, or remain on deposit, in an investment account or other interest-bearing account or accounts selected and maintained by each of the Defendants, but the Defendant's use or disposition of funds in the account attributable to the tax refunds would be prohibited pending further order of the court. There is no evidence that Nilson, Arave, Pugsley, Crockett, or Ure need the tax refunds for ordinary and necessary living expenses. The Committee's request is narrowly tailored to target and preserve the tax refunds pending a trial on the merits, but permits access to the funds by Nilson, Arave, Pugsley, Crockett, or Ure for extraordinary or unforeseeable expenses. Nilson, Arave, and Pugsley each concluded that they would be "severely damaged" if the court were to impound the funds, but only Nilson and Arave testified as to facts forming the basis for his conclusion.[54] Considering the harm to both the

---

have to prove insolvency and they haven't even gotten around to hiring the expert yet. He anticipates that it will be years before he will get this most fundamental of property rights in property that is rightly his. And everybody in the courtroom knows that that is true.

[54] Nilson testified that an order sequestering the tax refunds "will not only inhibit my ability to start anew on a financial level, but it will undoubtedly be seen by potential partners, investors, financiers, and almost everyone as a judgment that I have done something dishonest, that I threaten to do something dishonest, and that I am not to be trusted." Ex. 38, at 5:9-12. Arave stated that an order impounding the funds would "inhibit [his] ability to start anew on a financial level" and impact his campaign for mayor of North Salt Lake because it would "undoubtedly be seen by [his] neighbors and supporters as judgment that [he has] done something dishonest, that [he] threatened to do something dishonest, and that [he is] not to be trusted." Ex. 39, at 31:9-11.

1   Committee and these Defendants, and the narrow nature of the relief sought by the Committee,

2   the court finds that the balance of equities tips in favor of the Committee.[55]

3   D.    Public Interest

4        "In exercising their sound discretion, courts of equity should pay particular regard for the

5   public consequences in employing the extraordinary remedy of injunction.'" Winter, 129 S.Ct. at

6   376-377 (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)). "The public

7   interest analysis for the issuance of a preliminary injunction requires [the Court] to consider

8   whether there exists some critical public interest that would be injured by the granting of

9   preliminary relief." Indep. Living, 572 F.3d at 659.

10       Here, the court finds that the public interest factor is neutral. To the extent that the public

11  interest has been considered in the bankruptcy context, courts have identified the achievement of

12  reorganization as a public interest worthy of protection. In re Fullmer, 323 B.R. 287, 305 (Bankr.

13

---

14  [55] The Nilson Defendants also allege that the Committee's failed to take prompt action to pursue
    the tax refunds after dismissal of the complaint originally filed by JPMorgan Chase in Adversary
15  No. 6:08-ap-01359-PC, and that "[t]his unexplained and prejudicial delay should also be
    considered in the 'balancing of equities' element." Defendants' Memorandum in Opposition to
16  Motion for Preliminary Injunction, at 6:3-4. The Nilson Defendants' only evidence on this point
    is the testimony of Nilson and Nelson. Nilson testified that "had the Creditors' Committee
17  timely brought an action when it obtained standing to do so, these issues could have been
    resolved on fair notice without the kind of rush or emergency that the Creditors' Committee has
18  manufactured by its tactics." Nelson Declaration at 23:9-11, Nov. 16, 2009. Nelson testified in
    similar fashion, stating that "if the Creditors' Committee had brought this action earlier, the
19  merits almost certainly could have been resolved by this time, and I would not be in a situation
    where my funds get tied up on some 'emergency' resulting only from the delay, not to mention
20  having to bear the burden of an entirely unnecessary preliminary injunction procedure." Nelson
    Declaration at 9:23-26, Nov. 16, 2009. The court notes that the stipulation under the terms of
21  which the Committee was given authority to pursue causes of action on behalf of the estate was
    entered on February 13, 2009. Nilson and Arave filed their 2008 federal income tax returns on
22  April 30, 2009, and May 13, 2009, respectively, claiming their proportionate share of Woodside
    Group's 2006 and 2007 NOLs. The Committee did not learn that Nilson or Arave had received
23  the tax refunds until sometime later. The complaint initiating this adversary proceeding was filed
    on September 17, 2009. Given the circumstances and paucity of evidence regarding actual
24  prejudice, the court cannot find that the 7-month delay tips the balance of equities in favor of the
    Defendants.

25

26

27

                                          - 46 -

1  D. Nev. 2005).

2  E.      Security

3      Rule 65 (c) states that "[the] court may issue a preliminary injunction or temporary

4  restraining order only if the movant gives security in an amount that the court considers proper to

5  pay the costs and damages sustained by any party found to have been wrongfully enjoined or

6  restrained. The United States, its officers, and its agencies are not required to give security."

7  F.R.Civ.P. 65(c). Rule 65 "applies in adversary proceedings, except that a temporary restraining

8  order or preliminary injunction may be issued on application of a <u>debtor, trustee, or debtor in</u>

9  <u>possession</u> without compliance with Rule 65(c)." FRBP 7065 (emphasis added).

10     The Committee argues that "[s]ince [it] was appointed by the United States Trustee, a

11  division of the United States Department of Justice, and because this Motion is brought pursuant

12  to, among other things, the Committee's powers under Section 1103(c) of the Bankruptcy Code

13  and the Court's authorization to prosecute matters beneficial to the general creditor body under

14  the Authorization Motion, the Committee is excepted from the security requirement of

15  Bankruptcy Rule 7065(c)."[56] The Nilson Defendants disagree, asserting that neither the language

16  of Rule 7065 nor the court's order entered on February 13, 2009, authorizing the Committee, on

17  behalf of Woodside Group, "to investigate, prosecute and, subject to approval of this Court, settle

18  the Estate Causes of Action,"[57] exempt the Committee from tendering a bond in conjunction with

19  the relief sought.

20     Rule 7065 excepts from Rule 65(a)'s security requirement only a "debtor, trustee, or

21  debtor in possession." Although it may have standing to pursue on behalf of the estate the causes

22  of action set forth in its complaint, the Committee is not a "debtor, trustee, or debtor in

23  possession." Nor does the fact that the Committee was formed by the United States trustee

24  ————————————————————

25  [56] Motion for Order to Show Cause Why a Preliminary Injunction Should Not Issue and
Supporting Memorandum of Points and Authorities, at 25:5-11.

26

27  [57] See footnote # 18, supra.

1 pursuant to § 1102(a)(1) tuck the Committee within the scope of Rule 65(a)'s exemption for [t]he

2 United States, its officers, and its agencies." Section 1103(c), which enumerates the powers and

3 duties of the Committee, does not except a creditors' committee from either Rule 65(c) or Rule

4 7065, nor did the court's order entered on February 13, 2009, purport to do so, expressly or

5 impliedly. The Committee has not alleged nor established that it does not have the financial

6 resources to post a bond. See Cal. v. Tahoe Regional Planning Agency, 766 F.2d 1319, 1325

7 (9th Cir.) ("The court has discretion to dispense with the security requirement or request mere

8 nominal security where requiring security would effectively deny access to judicial review."),

9 amended, 775 F.2d 998 (9th Cir. 1985). Moreover, the Committee has not cited any case, nor

10 has the court found one, holding that a creditors' committee is relieved from the requirement of

11 an undertaking by the terms of either Rule 65(c) or Rule 7065.

12       The purpose of the bond is to guarantee payment of damages and costs incurred by a party

13 who is wrongfully enjoined or restrained. Wash. Capitals Basketball Club, Inc. v. Barry, 304

14 F.Supp. 1193, 1203 (N.D.Cal.), aff'd, 419 F.2d 472 (9th Cir. 1969). Damages for wrongful

15 injunction, both against the plaintiff and surety, are limited by the amount of the bond. See

16 Nintendo of Am. v. Lewis Galoob Toys, Inc., 16 F.3d 1032, 1036 (9th Cir. 1994) (holding that

17 "there is a rebuttable presumption that a wrongfully enjoined party is entitled to have the bond

18 executed and recover provable damages up to the amount of the bond"). Attorneys fees are not

19 recoverable as damages on the bond. Bass v. First Pac. Networks, Inc., 219 F.3d 1052, 1054 (9th

20 Cir. 2000). The court has considerable discretion in setting the amount of the bond. Wash.

21 Capitals, 304 F.Supp. at 1203. The Nilson Defendants "suggest a bond in the full amount

22 sequestered."[58] The Committee counters that, if it must provide security, a $20,000 bond is

23 adequate. The Committee has not presented evidence that it would be able to satisfy any

24 judgment for damages that might result from a wrongful issuance of an injunction. Given the

25 amount of tax refunds to be sequestered, the fact that the tax refunds will remain in the

26

27 [58] Defendants' Memorandum in Opposition to Motion for Preliminary Injunction, at 28:11-12.

- 48 -

1  possession of those Defendants enjoined, that such Defendants will be permitted to place the

2  funds in liquid investments as they see fit, and that the funds will be accruing interest or

3  dividends pending a trial on the merits, the court finds that a bond of $100,000 is proper pursuant

4  to Rule 65(c).[59]

III. CONCLUSION

5

6      For the reasons stated above, the court concludes that the Committee has made a clear

7  showing that it is likely to succeed on the merits of its unjust enrichment claim and is likely to

8  suffer irreparable harm in the absence of a preliminary injunction against Defendants, Nilson,

9  Arave, Pugsley, Crockett, and Ure.  The Committee has further established that the balance of

10  equities tips in its favor, and that injunctive relief is not contrary to the public interest.  Because

11  the evidence presented does not support a finding that irreparable harm is likely absent injunctive

12  relief as to the remaining Defendants, the Committee's motion is denied without prejudice as to

13  those parties.

14      The Committee's counsel is directed to lodge a proposed order granting the Committee's

15  motion for preliminary injunction consistent with this opinion.

16  Dated: January 22, 2010.

17

PETER H. CARROLL
18  United States Bankruptcy Judge

19

20

21

22

23

24  _____

25  [59] The amount of security may be increased or decreased by motion, after notice and a hearing,
for cause shown.  See Wash. Capitals, 304 F.Supp. at 1203.  See also 3 Moore's Manual: Federal
26  Practice and Procedure § 10A.20[8][a], at 10A-20 (2009) ("A party may move the court to
increase or decrease the amount of security so long as the restraint or injunction is in effect.").
27

| In re: | | CHAPTER: |
|---|---|---|
| | Debtor(s). | CASE NUMBER: |

## NOTE TO USERS OF THIS FORM:

**1)** Attach this form to the last page of a proposed Order or Judgment. Do not file as a separate document.
**2)** The title of the judgment or order and all service information must be filled in by the party lodging the order.
**3) Category I.** below: The United States trustee and case trustee (if any) will always be in this category.
**4) Category II.** below: List ONLY addresses for debtor (and attorney), movant (or attorney) and person/entity (or attorney) who filed an opposition to the requested relief. <u>DO NOT</u> list an address if person/entity is listed in category I.

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled Memorandum Decision_____

_____ was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

## I. **SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of January 22, 2010 , the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

- Evan C Borges    eborges@irell.com, bblythe@irell.com

- Donald L Gaffney    dgaffney@swlaw.com

- Lauren N Gans    lgans@stutman.com

- Eric S Pezold    epezold@swlaw.com, dwlewis@swlaw.com

- United States Trustee (RS)    ustpregion16.rs.ecf@usdoj.gov

- Andrea M Valdez    avaldez@fulbright.com

- George C Webster    gwebster@stutman.com

☐ Service information continued on attached page

## II. **SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States Mail, first class, postage prepaid, to the following person(s) and/or entity(ies) at the address(es) indicated below:

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                **F 9021-1.1**

| In re: | | CHAPTER: |
|---|---|---|
| | Debtor(s). | CASE NUMBER: |

☐ Service information continued on attached page

**III. TO BE SERVED BY THE LODGING PARTY:** Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s), and/or email address(es) indicated below:

☐ Service information continued on attached page

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                      **F 9021-1.1**

| In re: | | CHAPTER: |
|---|---|---|
| | Debtor(s). | CASE NUMBER: |

**ADDITIONAL SERVICE INFORMATION** (if needed):

Tony Castanares      tcastanares@stutman.com
Richard Krumholz     rkrumholz@fulbright.com
Mark James           MJames@hjdlaw.com
Gary Dodge           gdodge@hjdlaw.com
Anthony Arnold       aarnold@stutman.com
Stephan M. Ray       sray@stutman.com
Mark Deveno          mark.deveno@bingham.com
Nora K. Brunelle     rbrunelle@fabianlaw.com
Cameron Hancock      hancock.cameron@dorsey.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                                    **F 9021-1.1**